Argued and submitted February 1, 1989, the judgment affirmed as to guilt phase and reversed as to penalty phase and case remanded to the circuit court for resentencing January 11, 1990

# STATE OF OREGON,
*Respondent,*

*v.*

# STEPHEN LEWIS FARRAR,
*Appellant.*

## (CC 86-C-20505; SC S33949)

786 P2d 161

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief were Gary D. Babcock, Public Defender, and John P. Daugirda, Deputy Public Defender, Salem. Appellant filed a supplemental brief *pro se*.

Brenda J Peterson, Assistant Attorney General, Salem, argued the cause for respondent. With her on the briefs were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, Rives Kistler, Timothy A. Sylwester and

Douglas F. Zier, Assistant Attorneys General, Salem, and Teresa Ozias, Certified Law Student, Salem on the supplemental brief.

JONES, J.

Linde and Fadeley, JJ., dissent for the reasons stated in the dissenting opinions in *State v. Wagner,* 309 Or 5, 20, 786 P2d 93 (1990), and *State v. Moen,* 309 Or 45, 98, 786 P2d 111 (1990).

**JONES, J.**

Defendant appeals his conviction of aggravated murder and sentence of death. The review of this case will address all of defendant's 19 assignments of error raised in defendant's voluminous brief and addenda.

## ASSIGNMENT OF ERROR NO. 1

*Pretrial proceedings; selective prosecution*

The first question posed by defendant to this court is:

"Did the district attorney engage in an unfair selective prosecution in his decision to prosecute defendant for aggravated murder and in his refusal to engage in plea negotiations?"

In support of an affirmative answer to this question, defendant argues:

"The district attorney denied defendant equal treatment and engage in unfair selective prosecution by his standardless, *ad hoc* election to prosecute defendant for aggravated murder and by his refusal to engage in plea negotiations.

"Defendant was one of three persons charged with aggravated murder out of a pool of 15 to 18 alleged murderers. * * * Concerning defendant, the district attorney summarily represented that defendant had a history of criminal activity and the state could produce evidence on the guilt and sentencing issues. On this record, the state failed to prove equal and fair treatment in the charging decision.

"The denial of plea negotiations established an unfair selective prosecution in this case. The district attorney entered into plea negotiations in every case alleging murder or aggravated murder except the present case. Although his office had 'unwritten guidelines' which could be applied in weekly staff discussions, the district attorney did not articulate the contents of the guidelines or indicate that they were specifically applied in Farrar's case or in other cases. The prosecutor merely explained the two *ad hoc* plea negotiations with Williamson and Moen. This record did not establish the existence of a coherent systematic policy and equal application thereunder. The refusal to negotiate with Farrar constituted unequal treatment under Article I, section 20 and the Fourteenth Amendment."

The facts relevant to this first question were developed during a January 5, 1987, pretrial hearing. At that hearing, District Attorney Penn testified concerning (1) the bases for the charging decisions and dispositions in Marion County's various homicide prosecutions arising after enactment of the present death penalty law and (2) his office's 1980 policy manual and additional unwritten guidelines.

Dale Penn testified he had been a deputy district attorney for eight years and district attorney for two years commencing January 1985. At the time of this hearing, Oregon's present death penalty statute had been in effect for 18 months. During this 18-month period, 25 to 30 homicides had occurred in Marion County. Charges had been brought on 15 to 18 of these killings.[1] The district attorney sought three aggravated murder indictments. He explained:

> "These are the only three cases that upon investigation, we were able to develop evidence on all of the elements of the crime, plus the sentencing factors for the death penalty, and the only cases in which we were able to present that evidence to the Grand Jury and the Grand Jury would agree that there was sufficient evidence to proceed."

Defendant, Moen and Williamson were the three individuals charged with aggravated murders.

The district attorney and Williamson entered into plea negotiations, and Williamson pled guilty to two counts of murder. Penn described the case:

> "[T]hat case was the very first case that we had dealt with in Marion County under the death penalty.
>
> "Looking back upon it, I would not have submitted that to the Grand Jury requesting the death penalty to begin with because there was insufficient evidence on the three sentencing factors to justify death sentence. And that was the primary reason for us entering into negotiations with defense counsel and offering something other than death sentence; because of that particular defendant's young age, 20 years old, lack of prior record, some very severe mitigating circumstances, or at least circumstances which the victims engaged in which may have justified some retaliation by the defendant.

---

[1] Eighteen of these homicides occurred in 1986. Charges were instituted in 13 of the 18 cases.

"Those factors that went directly to the three sentencing factors. And I don't believe we had sufficient evidence to really justify seeking the death sentence in that case."

The district attorney and Moen entered into plea negotiations, the prosecutor offered a negotiated settlement, but Moen refused the offer. Penn explained:

"We were approached by Mr. Moen's counsel on whether or not we would entertain anything other than a guilty plea and submission of the death penalty.

"And after analyzing the case and the evidence that we had available to us, and then, again, the factors that I've detailed in my affidavit, we made the offer of a guilty plea to aggravated murder without imposition of the death penalty. That has not been accepted; and to my knowledge, there's no likelihood it will be accepted."

In the present case, Farrar was age 29 on the date of his arrest. Farrar's attorney approached the district attorney regarding the possibility of plea negotiations. Penn explained his response:

"Given again the factors that I put in the affidavit, and particularly the admissible evidence that we have in this particular case on all the elements, including the three sentencing elements, it's my opinion we have sufficient evidence to convict the defendant and also to seek the death penalty.

"And given the nature of the crime and given the nature and background of this defendant and the likelihood he's going to continue to present a substantial danger to the public for many years into the future, we have stated that our position is that he must plead guilty to aggravated murder with the death penalty."

The district attorney explained his unwillingness to engage in plea negotiations in the present case, as follows:

"Q. [DEFENSE COUNSEL]: And, in fact, just as you've said, this is your first case of murder of the approximately 17 or 18 individuals where, in fact, plea negotiations are not going to be entertained?

"A. [PROSECUTOR]: Well, plea negotiations from the viewpoint that something other than the charged offense should be involved. Now, there are many times when we negotiate with people and our negotiation is, plead to the charge; or

our negotiation will be, plea to the charge and we'll recommend maximum sentence, which is basically what our negotiation is in Mr. Farrar's case. It's just that the death penalty isn't involved in those other cases.

"Q. And, in fact, in several of those cases, not to get specific, there may be other charges that are not brought, there may be other considerations as well than the mere charge?

"A. Certainly. That's true. There are also some cases where we say there are no other charges out there. But this person must plead to this charge and we'd be free to make a recommendation.

"Now, admittedly, that is the hard-line approach. And there are so many factors involved, that it doesn't come down to a lot of cases where that ends of being the result. But Mr. Farrar's case is one of them."

With this uncontested background, defendant sets forth two subsets of error under his first claim:

"(A) *The Charging Decision*

"* * * [T]he first issue is whether the district attorney denied defendant equal treatment by the standardless election to commence a prosecution for aggravated murder."

and

"(B) *Denial of Plea Negotiations*

"* * * [T]he second issue is whether the district attorney's refusal to engage in plea negotiations with defendant constituted 'unequal treatment' and unfair selective prosecution. The state failed to meet its burden of showing a systematic policy."

*1. Answer to (A)*

■ Defendant's claim that "the district attorney denied [him] equal treatment by the standardless election to commence a prosecution for aggravated murder" is without merit.

Defendant does not dispute that the state had a sufficient factual basis for charging him with aggravated murder. The district attorney's decision to seek an aggravated murder indictment against him was proper on its face. Placing defendant within the class of persons charged with aggravated murder was consistent with a proper application of a neutral, objective and appropriate standard: probable cause to believe

that defendant committed the crime. The record shows that that was the district attorney's motive here.

Defendant does not contend, and no evidence in the record suggests, that the district attorney's decision to seek an aggravated murder indictment was prompted by improper motives, or indeed by any reason other than that the district attorney had sufficient evidence to prove beyond a reasonable doubt that defendant committed aggravated murder. The district attorney's decision to seek an aggravated murder indictment against defendant did not treat him differently from any other similarly situated person. Nothing in this record suggests that the district attorney ever has failed or refused to seek an aggravated murder indictment when he had probable cause to believe that a specific persons committed aggravated murder in Marion County.

The mere fact that other murders have occurred in the county and that some of the other murderers were charged only with non-capital murder does not establish that those defendants were similarly situated persons whom the district attorney treated more favorably. Not every homicide fits the restrictive statutory definition of "aggravated murder," *see* ORS 163.095, and the existence of probable cause to indict a person for simple murder does not necessarily mean that the facts also support an indictment for aggravated murder. The record reveals that the other contemporaneous murder defendants were not in fact "similarly situated" because the state did not have evidence to charge any of them with aggravated, as distinguished from simple, murder.

The circuit court correctly refused to dismiss this case based on defendant's allegation that the district attorney's decision to seek an aggravated murder indictment against him unconstitutionally denied him equal protection under the state or federal constitutions.

### 2. Answer to (B)

As mentioned, defendant's second complaint under his first assignment of error is that "the district attorney's refusal to engage in plea negotiations with [defendant] constituted 'unequal treatment' and unfair selective prosecution."

■ ■ The threshold question is whether "plea negotiations" fall within the ambit of "privileges and immunities" for purpose of an Article I, section 20 analysis.[2] Although defendant cites no authority for the proposition that plea bargaining, standing alone, is a privilege, immunity, or benefit of state or federal constitutional significance, we assume that standardless or irrational plea bargaining or a refusal to plea bargain for an improper purpose would be a governmental act within Article I, section 20. *See* Bienen, *The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion,* 41 Rutgers L Rev 27 (1988). Whether it is or not, the district attorney's refusal to negotiate or plea bargain in this case did not violate defendant's rights protected by Article I, section 20. The district attorney's decision not to pursue plea negotiations with defendant did not deny him equal privileges and immunities. Defendant's total argument on this issue is as follows:

> "In all cases except defendant's case, the prosecutor entered into plea negotiations. * * * Penn attempted to justify his rationale on only three cases.
>
> "Because of Williamson's young age (20) and lack of prior record, and mitigating circumstances about the crime (Williamson responded to a homosexual attack), Penn conceded that he was overcharged and claimed guilty pleas to unaggravated murder were justified.
>
> "* * * Penn noted that Moen, age 50, suffered from medical problems and probably would not physically survive 20 years in prison. * * *
>
> "* * * * *
>
> "Penn based his decision on the facts that Farrar was age 29, had a prior record, and an antisocial personality; the state had sufficient evidence to prosecute defendant for aggravated murder with a death penalty sanction; and Penn knew of no mitigating evidence."

From the above, defendant argued that:

> "Age is not a determinative factor. Compared to Farrar, Williamson was younger (age 20) and Moen was older (age

---

[2] Defendant does not complain about violation of ORS 135.405(4), which provides that "[s]imilarly situated defendants should be afforded equal plea agreement cpportunities." We conclude as a preliminary matter that there was no violation of the statute.

50). Life sentences were offered in both of those cases. There was no evidence of the ages of the other murderers.

"The criminal record was not the key factor. Presumably, Moen and some (if not all) of the other murderers had criminal records. All of the others were offered plea negotiations.

"Penn opined that he could prove aggravated murder and the death penalty sanction in Farrar's case. Presumably, he could do so in Moen's case; he did not indicate that he could not do so.[3] Penn did not justify why he could not prove aggravated murder in the other cases.

"Finally, Penn stated he did not yet know of any mitigating evidence in Farrar's case. This position occurred at the early stages of defendant's case. Penn relied upon the homosexual attack in Williamson as mitigation. In contrast, there was no mitigation cited in Moen's case. Penn merely relied upon administrative convenience.

"The Marion County District Attorney did not establish a consistent standard for plea negotiations. His refusal to negotiate with Farrar constituted unequal treatment under Article I, section 20 and the Fourteenth Amendment.

"[3] - * * * Moen was convicted of aggravated murder and sentenced to death. *See State v. Ronald Howard Moen,* SC No. S33952 (review pending)."

Assuming the "privilege or immunity" clause involves plea bargaining or the prosecution's willingness to enter into a plea agreement, the appropriate persons for the analysis of disparate treatment are those who have been charged in Marion County with aggravated murder: Moen, Williamson and defendant. The district attorney concededly treated Moen and Williamson differently. The district attorney negotiated with Moen and offered him an agreement not to seek the death penalty if he would plead guilty to aggravated murder, and he negotiated with and offered Williamson the opportunity to plead guilty to two lesser-included charges of simple murder.

That defendant was treated differently from Moen and Williamson does not establish *ipso facto* a violation under either Article I, section 20, or the Equal Protection Clause. Rather, the appropriate inquiry is whether the difference in treatment was merely "haphazard," *i.e.,* without any attempt to strive for consistency among similar cases. The district

attorney's actions were not based on class discrimination, animus to defendant or his attorney, or on concerns collateral to fair prosecution of defendant for aggravated murder. The district attorney did offer a clear, rational, consistent, and consequently sufficient justification for treating defendant differently from Moen and Williamson.

The district attorney offered Moen a life sentence in exchange for a guilty plea to aggravated murder "because Moen is 50 years old with severe medical problems which insure that a 20-year mandatory sentence [on an aggravated murder conviction] will be the equivalent of incarceration until death." Both aspects of the offer had a rational relation to the prosecution decision — a guilty plea to the principal offense has obvious advantages to the state, and the offer to waive the death sentence in return for the plea was reasonable under the circumstances. Given that rationale for the offer to Moen, the district attorney's refusal to offer the same agreement to defendant is both rational and consistent. Defendant, who was 29 years old and apparently in good health at the time of trial, was not similarly situated to Moen for the purpose of the criteria employed by the district attorney in offering a plea bargain to Moen.

The Williamson case presents a distinct but related concern. Williamson was allowed to plead guilty to two lesser-included charges of simple murder because

"he was only twenty years old, there was evidence of provocation by the victims, and the facts of the case would have created sympathy for the defendant because the killing took place in response to a homosexual sexual attack by the victims, according to the defendant's version of the crime."

Furthermore, the district attorney testified that given the three statutory questions he did not have "sufficient evidence to really justify seeking the death sentence" in Williamson's case. As with the offer to Moen, both aspects of the offer to Williamson had a rational relation to the prosecutorial decision — a guilty plea to two counts of the lesser included charge of simple murder had obvious advantages to the state, and the offer to dismiss the aggravated murder charge was reasonable under the circumstances.

Defendant failed to establish that the district attorney's refusal to engage in plea negotiations with him constituted a violation of Article I, section 20, or of the Equal Protection Clause.

## ASSIGNMENT OF ERROR NO. 2

*Search warrants*

Defendant's second assignment of error concerning search warrants sets forth five subsets of claimed error:

"[1]. Were the three search warrants based upon adequate probable cause?

"[2]. Was the execution of warrant 3A (search of defendant's person) flawed because neither the affiant nor the executing officer properly confirmed and served a certified true copy of the warrant on defendant before undertaking the search and seizure? Were the search warrants 3B (search of defendant's residence) and 3C (search of defendant's automobile) invalid because they were not supported by original affidavits?

"[3]. Did the three warrants contain sufficiently particular descriptions of the person or property and place to be searched?

"[4]. Was the authorization clause in the three warrants, which empowered a search for 'any other physical evidence of the aggravated murder,' unduly broad?

"[5]. Did the searches and seizures in defendant's residence and automobile exceed the authorization clause of warrants 3B and 3C?"

The trial court did not commit error in refusing to suppress any of the evidence seized.

1. *Lack of probable cause.*

Detective Terry L. Crawford's affidavit for search warrants included:

1. An incident report about the February 26, 1986, murder of Muriel Lucille Bentson and burglary of her residence, which indicated that the suspect had broken a window and torn a screen, and investigators had found a .38 caliber bullet, casing and the victim's body at the scene.

2. Sgt. Kominek advised affiant about (a) other evidence

found at the crime scene, including a brown hair, cigarette, Nike shoe prints and (b) that the victim had a facial bruise resembling a Nike shoe print, .38 caliber bullets were removed from her body and a pathologist opined that the victim was killed by multiple gunshot wounds.

3. Two officers and named informant Daniel Knottnerus related Melinda Ritchey's hearsay statements which

(a) described defendant and his activities as a burglar;

(b) indicated defendant lived with her at 1164 Pine Street and the apartment contained stolen property from other burglaries;

(c) linked Ritchey to a 1968 Oldsmobile vehicle;

(d) described defendant's admissions of killing a Keizer woman and committing a burglary;

(e) described defendant's actions of displaying the stolen gems and throwing away the pistol and a syringe at a Hawthorne Street location.

4. As partial corroboration, Crawford contacted the apartment manager's wife concerning the tenants, viewed the suspect vehicle and made records checks on Ritchey and defendant. A criminalist test-fired the weapon produced by Knottnerus [who gave the weapon to the police] and opined that it fired the bullets found at the crime scene.

5. Concerning Ritchey's 'veracity,' Crawford indicated she was taken into custody on arrest warrants for forgery and probation violation. Her prior convictions included two convictions for theft, one conviction for an attempted theft by deception and one conviction for false swearing. In exchange for Ritchey's statements, the police promised no prosecution for murder if their investigation revealed that she was not involved in the crime.

6. Crawford made a general recital that trace evidence may be left at or removed from the crime scene by a perpetrator and that state criminalists can analyze such evidence.

Defendant does not challenge the truth of the facts set out in the search warrant affidavits; rather, he argues only that these facts were insufficient to establish probable cause to support issuance of the search warrants. Defendant chal-

lenges the affidavits' sufficiency under ORS 133.545, under Article I, section 9, of the Oregon Constitution, and under the Fourth Amendment to the United States Constitution.[3]

■ We first discuss whether the two-pronged *Aguilar/ Spinelli*[4] standard set forth in ORS 133.545 for determining the sufficiency of a search warrant based on information supplied by an *unnamed* informant applies to information supplied by *named* informants. The *Aguilar* and *Spinelli* cases both involved unnamed informants, and the test derived from their holdings applies only to affidavits based on hearsay statements from *unnamed* informants. The express terms of ORS 133.545, which codified the *Aguilar/Spinelli* test, specifically limit its application to *unnamed* informants. ORS 133.545 does not apply to *named* informants.

Where the information in the affidavit is provided by a named informant, as in the instant case, the *Aguilar/Spinelli* standard is not required by statute or by the Oregon Constitution. *See State v. Montigue,* 288 Or 359, 605 P2d 656, *cert den* 449 US 846 (1980). In *State v. Villagran,* 294 Or 404, 408, 657 P2d 1223 (1983), this court stated:

---

[3] ORS 133.545 provides, in pertinent part:

"(4) The application shall consist of a proposed warrant in conformance with ORS 133.565, and shall be supported by one or more affidavits particularly setting forth the facts and circumstances tending to show that the objects of the search are in the places, or in the possession of the individuals, to be searched. If an affidavit is based in whole or in part on hearsay, the affiant shall set forth facts bearing on any *unnamed* informant's reliability and shall disclose, as far as possible, the means by which the information was obtained." (Emphasis added.)

Or Const, Art I, § 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers and effects, against unreasonable search or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

US Const, Amend IV, provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[4] *Aguilar v. Texas,* 378 US 108, 84 S Ct 1509, 12 L Ed 2d 723 (1964); *overruled by Illinois v. Gates,* 462 US 213, 103 S Ct 2317, 76 L Ed 2d 527, *reh den* 463 US 1237 (1983); *Spinelli v. United States,* 393 US 410, 89 S Ct 584, 21 L Ed 2d 637 (1969), *overruled by Illinois v. Gates,* 462 US 213, 103 S Ct 2317, 76 L Ed 2nd 527, *reh den* 463 US 1237 (1983).

> "Our function, when faced with such an argument, is to determine whether a neutral and detached magistrate could conclude, based on the facts and circumstances shown by the affidavit, that there was probable cause to believe that the search would discover things specified in the affidavit in the places requested to be searched. *See* ORS 133.555(1), (2). We are to construe the supporting affidavit in a common-sense and realistic fashion. *State v. Tacker,* 241 Or 597, 601, 407 P2d 851 (1965), quoting from *United States v. Ventresca,* 380 US 102, 108, 85 S Ct 741, 13 L Ed 2d 684 (1965)."

■ The facts set forth in the search warrant affidavits, when construed in a common-sense, realistic fashion, establish probable cause to believe that a search of defendant's home, car, and person would result in evidence linking him to the crimes of burglary and murder.

The affidavit was based in part on two named informants: Melinda Ritchey and Daniel Knottnerus. Ritchey's basis of knowledge was established in the affidavits to be her personal knowledge from observations of and conversations with defendant, with whom she had lived for the previous five months. Knottnerus' basis of knowledge was his personal observation as well as his conversation with Ritchey. Reliability of the information is buttressed when the informant allows his or her name to be used, because it exposes the informant to a charge of initiating a false report to a law enforcement agency. ORS 162.375.

As to the credibility of informants, Ritchey, who was then defendant's girlfriend, had a prior criminal record but was not a party to the instant crime. Her credibility was strengthened because it was a declaration against penal interest, in that it implicated her as an accessory after the fact to defendant's crimes. *See* ORS 162.325; *State v. Carlile,* 290 Or 161, 167, 619 P2d 1280 (1980). Much of Ritchey's information was impossible to corroborate because it involved acts or conversations involving only herself and defendant; the police, however, were able to corroborate many portions of Ritchey's statements. For example, they corroborated that she and defendant lived together at 1164 Pine Street in Salem, which indicated that Ritchey was in a position to know and have access to the unique and incriminating information she provided. More importantly, much of Ritchey's information was corroborated by information provided by Knottnerus and by

physical evidence previously obtained by the police, including the details about the type of weapon used in the murder and the disclosure of where defendant discarded this gun.

Knottnerus was the other named informant. The affidavit on its face states that Knottnerus had no criminal involvement in this crime and was not the subject of any criminal investigation. His statements were consistent with the statements Ritchey independently made to the police, and they contained additional information about the burglary and murder from Ritchey that further demonstrated their reliability, including that Ritchey told him that defendant "had been doing a burglary at the old woman's house when the old woman came home and encountered [defendant]. [Ritchey] said that they had a fight and [defendant] struck the old woman in the face knocking her down to the floor. [Ritchey] said that the old woman got up and [defendant] shot the old lady." This information regarding defendant's fight with a striking of his murder victim is significant in establishing the reliability of Knottnerus' statement. Officer Crawford's affidavit states that no information regarding a fight or a beating of the victim had been reported to the public. Accurate knowledge by Ritchey of this incriminating information, which she could have learned only from the murderer, tended to demonstrate the reliability of her statements and of Knottnerus' ability to recount the details of his conversation with Ritchey accurately.

The police also corroborated Knottnerus' information about where Ritchey lived and what car she drove. Moreover, Knottnerus' recovery of the murder weapon, reportedly from the exact location where Ritchey said defendant threw it, corroborated Ritchey's statement about where the gun was thrown as well as Knottnerus' reliability in accurately reporting his conversation with Ritchey. It also further linked defendant to the crime.

The affidavit additionally contained information that established probable cause to believe trace evidence as well as stolen property would be found on the murderer's body, in his residence, or in his girlfriend's car.

The trial court correctly concluded that, based on reliable information from credible named informants, it was reasonable to believe that seizable evidence of the burglary

and murder probably would be found on defendant's person, in his house, and in his girlfriend's car. The warrants authorizing searches of these specific places were based on probable cause.

## 2. *Improper documentation of signatures on warrant and affidavit.*

Defendant claims that Detective Kominek did not provide him with a proper certified true copy of the search warrant and that Kominek "forged" the signatures on the copy he gave defendant. These contentions are without merit.

The trial court heard defendant's repeated claims on this issue and found them to be factually meritless by upholding the validity and sufficiency of the warrants. Under *Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968), if the evidence sustains a trial court's finding of historical facts, those findings will not be overturned on review.

■ The evidence in the record supports the trial court's factual findings. Detective Crawford, the affiant, testified that he took the affidavit to Judge Barlow's home on a Saturday night and that he swore to the truth of his affidavit and signed it in the presence of the judge. Judge Barlow, a Marion County District Judge, testified that he administered an oath to Detective Crawford and personally observed him sign the affidavit. Judge Barlow further testified that he signed the bottom of this affidavit as a certifying witness and that he personally authorized and signed each of the three search warrants. Detective Crawford testified that he subsequently conformed copies of the two search warrants authorizing the search of defendant's apartment and his girlfriend's car. Detective Kominek testified that he gave defendant a certified true copy of the search warrant authorizing the search of defendant's person; specifically, Kominek stated that he filled in the conformed signature of the judge. By ruling as it did, the trial court obviously believed these witnesses and disbelieved defendant's testimony. The trial court's findings are supported by the record and its conclusion that service of a conformed copy on defendant was adequate was not erroneous.

■ Defendant further argues that an original affidavit

must be attached to each original search warrant and, therefore, that two of the warrants issued below (the ones authorizing the search of defendant's apartment and his girlfriend's car) were invalid and unlawful because only a photocopy of the affidavit was attached to the warrants. This argument is without any merit.

Detective Crawford presented an original affidavit that set forth his reasons why probable cause existed to support three search warrants: to search defendant's body, his apartment, and his girlfriend's car. He submitted three individual search warrants; one directed to each location. All three warrants were kept together. The magistrate found probable cause existed to search each location based on this affidavit, and he signed each of the three search warrants. The original affidavit was attached to the original copy of the first search warrant (authorizing the search of defendant's body). Subsequently, photocopies of the original affidavit were attached to the other two search warrants.

Defendant claims that ORS 133.545 requires an original affidavit to be attached to the search warrant but cites no authority for his position. Contrary to his contention, ORS 133.545 does not require an original affidavit to be part of the application for a search warrant.

The issuing magistrate signed the original affidavit as a witness and correctly determined at the same time that this single affidavit established probable cause for issuance of the three attached search warrants. The magistrate personally signed each original search warrant. For administrative convenience, photocopies of the original signed affidavit were attached to the court's copies of the latter two warrants. As stated, this claim is without merit.

3. *Lack of specific description of the address and areas to be searched.*

The requirement that a warrant particularly describe the place to be searched originated from a desire to prevent the abusive use of general warrants. *See generally State v. Anspach,* 298 Or 375, 378, 692 P2d 602 (1984); *State v. Atkinson,* 298 Or 1, 15-16, 688 P2d 832 (1984). As stated in *State v. Cortman,* 251 Or 566, 569, 446 P2d 681 (1968), *cert den* 394 US 951 (1969), this requirement was designed "to narrow the

scope of the search to those premises for which a magistrate has found probable cause to authorize to search."

■ Contrary to defendant's contention that the description of the Marion County Jail required the police to "search the entire jail to locate defendant," the warrant authorized a search of defendant, not of the jail. Furthermore, the law enforcement officials presumably could ascertain in which cell defendant was housed before beginning their search. This warrant posed no threat of an overbroad search and no evidence was seized in the jail other than by a search of defendant.

■ Defendant's challenges to the second and third search warrants, authorizing searches of his apartment and his girlfriend's car, raise similar claims and are discussed together. Defendant contends that a more detailed description of the exterior details of the apartment (such as the color of the building and doors) and the car (such as its color or vehicle identification number) was required, and that the warrants should not have allowed searches of the entire apartment and car but should have been restricted to specific areas inside them. These contentions also are meritless. The warrants accurately and adequately described the areas to be searched.

The second search warrant states:

"YOU ARE THEREFORE COMMANDED to make immediate search of: 1164 Pine Street NE, Salem, Marion County, Oregon which is an apartment in The Pine apartment complex, and the residence of Stephen Lewis Farrar, aka Timothy Michael House, and is located in the east building of a two building apartment complex in the southern half of the second floor. The apartment complex is located on the southeast corner of Cherry Avenue NE and Pine Street NE, Salem, Oregon.

"TO SEARCH FOR: White cloth bag, black athletic bag, TV, VCR, long underwear, cigarette butts, Floor sweepings, Nike shoes, clothing of Stephen Lewis Farrar, .380 Remington Peters semi automatic ammunition, casing, and any and all gun cleaning equipment; A diamond ring, necklaces, bracelets or other jewelry belonging to Murial Lucile Bentson; Ski mask and leather gloves; Any records pertaining to ammo or gun purchases and any other physical evidence of the aggravated murder of Muriel Bentson * * *."

The third search warrant states:

> "YOU ARE THEREFORE COMMANDED to make immediate search of: A 1968 Oldsmobile Toranado automobile, Oregon license No. AMN878 which is presently parked on the south side of The Pine apartment Complex hear the east building located near 1164 Pine Street NE, Salem, Marion County, Oregon. You are also commanded to tow the 1968 Oldsmobile to the Oregon State Police Crime Detection Laboratory automobile processing facility in Springfield, Oregon for searching and processing of the Oldsmobile.
>
> "TO SEARCH FOR: cigarette butts, Floor sweepings, Nike shoes, clothing of Stephen Lewis Farrar, .380 Remington Peters semi automatic ammunition, casings, and any and all gun cleaning equipment; A diamond ring; necklaces, bracelets or other jewelry belonging to Muriel Lucile Bentson; Ski mask and leather gloves; Any records pertaining to ammunition or gun purchases and any other physical evidence of the aggravated murder of Muriel Bentson * * *."

The detailed description of defendant's apartment, listing its street address and its location within the apartment complex, was sufficient to meet the standards under *State v. Cortman, supra,* and our recent case of *State v. Devine,* 307 Or 341, 768 P2d 913 (1989). Similarly, the description of the car by license plate number and by location also was sufficient to assure that the proper car was towed and searched. The search of the car and the apartment was justified by the warrants.

4. *Excessive scope of authorization of items to be searched for and seized.*

ORS 133.535 authorizes searches and seizures in very broad terms, granting authority to search for and seize "[c]ontraband, fruits of crime, or things otherwise criminally possessed."

In the instant case, the police were investigating a burglary and a murder in which defendant had been identified as the perpetrator. Although they knew that the murderer shot and killed the victim with a semi-automatic weapon during the burglary, they did not know what physical evidence in defendant's apartment or his girlfriend's car would tie him to the crimes. The warrants specifically listed in detail a number of items that the police reasonably believed would be found on defendant's person, in his apartment, and in his girlfriend's

car. They did not know with any greater detail everything that might be found during the search.

This court has upheld similarly phrased search warrants in the context of different crimes. In *State v. Forseth,* 302 Or 233, 729 P2d 545 (1986), this court upheld the seizure of vials containing white powder under a search warrant authorizing search for "the controlled substance marijuana and evidence of its use and possession." There was no violation of state statute or constitution. *Forseth* was based on an interpretation of ORS 133.585, which provides:

> "The scope of search shall be only such as is authorized by the warrant and is reasonably necessary to discover the persons or things specified therein. Upon discovery of the persons or things so specified, the officer shall take possession or custody of them and search no further under authority of the warrant. If in the course of the search the officer discovers things, not specified in the warrant, which the officer has probable cause to believe to be subject to seizure under ORS 133.535 which the officer did not have probable cause to expect to find, the officer shall also take possession of the things discovered."

Contrary to defendant's claims, the search warrants did not grant "the police a *carte blanche* to search for any evidence" and to seize anything they encountered. They were restricted to items relating to the murder of Muriel Bentson, a very specific crime. The limitation in the search warrant relating to a specific murder rendered it sufficient.

5. *Excessive execution of warrants involving seizures exceeding search authorizations.*

Defendant contends that the police exceeded their authority under the search warrants in seizing from his apartment the following items: a list of home addresses taken from newspaper funeral announcements, a rent receipt, carpet standards, a bath rug, a bath towel, a bath brush, a bath washrag, a red box with scales, a towel, and a purse containing red gloves and a flashlight. He further contends that the police similarly exceeded their authority in seizing a notebook, two knives, a crowbar, and carpet standards from his girlfriend's car. Defendant's essential claim is that the warrants, by specifically itemizing certain items, restricted seizure solely to those items and that the further seizure of any other physical evidence was not warranted.

Only one of the items defendant challenges was introduced at trial against him: the rent receipt. His challenge to

the rent receipt is meritless. The affidavit supporting the search warrant mentioned that defendant had used or was using an alias. The rent receipt was important to establish identity and to link defendant to the apartment, where incriminating evidence was found. The police acted within their scope of authority when they seized the rent receipt.

### Conclusion

The searches did not violate any Oregon statute, Article I, section 9, of the Oregon Constitution, or the Fourth Amendment to the United States Constitution.

## TRIAL - GUILT PHASE

### Facts

We take the relevant facts received in evidence in the guilt phase of the trial from defendant's appellate brief:

On the evening of February 25, 1986, at about 8 p.m., 79-year-old Muriel Bentson returned for the last time to her home on Windsor Island Road North in Keizer. Bentson's brother was unable to contact her the following day so he telephoned her niece, who went to Bentson's home and became suspicious when she saw a broken basement window and athletic shoe prints near the back of the house.

A police officer arrived and entered the house through a rear sliding glass door that appeared to have been forced open. The living room, dining room and a first floor bedroom had been ransacked. Two upstairs bedrooms had not been disturbed. Bentson's body was discovered lying face up in the entrance hallway. She was dressed in the clothes she was wearing when she entered the house the night before.

An autopsy revealed that Bentson had been shot at least three times from the front and two times from the back. She also suffered multiple "blunt force type" injuries, including on her left cheek "a patterned injury * * * as a stomping pattern from a shoe." The injury to the cheek was consistent with the athletic shoe prints found outside the house and other shoe prints found inside the house.

About two weeks after the homicide, police received information from inmates at the Marion County Jail that Dan Knottnerus might have information about the case. On March

7, officers met with Knottnerus, who gave them a Beretta pistol. Ballistics tests were performed that night, and the gun was identified as the murder weapon.

Knottnerus led police to the Pine Street Apartments in Salem, where he said a girl lived who was connected to the gun. A couple was living at the apartment under the names Tim and Melinda House. A car at the apartment was registered to Melinda Ritchey.

Early on the morning of March 8, police stopped Ritchey as she drove back to the apartment. She was arrested and agreed to talk to the police after she was told she would not be charged if she was not involved in the murder. Ritchey told the police that defendant lived in the apartment with her. The police then went to the apartment and discovered defendant was not there.

Ritchey told the police that defendant might have gone to Rick Lancaster's apartment in Keizer. The police then went to Lancaster's apartment, where they found defendant hiding in a crawl space. Defendant was arrested.

Ronald Tipton testified that he was a coin and jewelry dealer at a flea market in Salem. He purchased items from defendant on three or four occasions. During February or early March 1986, he paid defendant $400 for a diamond ring, a sapphire ring and a gold bracelet. The rings and bracelet were subsequently confiscated by the police after being identified as belonging to Muriel Bentson by a jeweler who had previously appraised her jewelry collection. The sapphire ring was identified by Bentson's niece as being identical to the one taken when the victim was killed.

In early March, a bottle and can collector found the Beretta pistol near some bushes in the area Ritchey testified that defendant threw his gun away after the killing. The gun had been stolen during a residential burglary in Salem in October or November 1985.

A criminalist performed gun, gun oil, hair and fiber comparisons. He concluded that the Beretta fired the shots that killed Bentson. The police had recovered hundreds of hairs from the victim's house and two hairs from the gun. The criminalist compared defendant's hair standards to some of the hairs from the house and the hairs from the gun. He

concluded that defendant's hair was similar to several hairs found in the house and the hairs from the gun. The criminalist was able to perform PGM blood typing on a hair found on the victim's shoe. He concluded that the PGM of the hair was similar to defendant's PGM type. A cotton fiber found under the victim's fingernail was similar to the fibers of a shirt found in defendant's apartment. Some gun oil on the Beretta was similar to one of the oils found in defendant's apartment.

The police purchased a pair of gray Nike shoes that Ritchey identified as similar to the shoes defendant wore on the night of the killing. The state introduced a photograph of defendant wearing gray shoes that were similar to the shoes the police purchased. The photograph was obtained during a search of Ritchey's car after defendant's arrest.

A criminalist testified that the shoe prints left at the scene matched prints left by the Nike shoes the police purchased. The Converse shoes that defendant was wearing when he was arrested had a different sole pattern, but their size was similar to the shoes that left prints at the scene.

Rick Lancaster lived at the Orchard Court Apartments, which were located across a field from the victim's home. He was a friend of defendant and usually saw him three or four times a month.

Lancaster testified that he was in a car with defendant and Ritchey several weeks before the killing. They drove past Bentson's home as she was backing her car out of the driveway. Defendant said, "That's an easy hit." He then reached under the seat and said, "Shit, I don't have my gloves." Ritchey also described this incident.

Lancaster testified that defendant came to his apartment on the night of February 25 and said he needed a ride home because his car had broken down. He was wearing jeans, tennis shoes and a dark shirt under a wool shirt. Lancaster thought he was also carrying a handbag. Lancaster drove defendant home to the Pine Street Apartments. Lancaster found Ritchey's Ford Toronado in the Orchard Court parking lot the following morning. It was flooded and had bad spark plugs, but he was able to start it and drive it to defendant's apartment.

Bruce Gress was in an isolation cell near defendant's

cell after defendant's arrest on the murder charge. Gress testified that he had several conversations with defendant in which defendant asked about aspects of criminal law. On one occasion, Gress asked defendant if he committed the murder. Defendant responded, "I really screwed up this time." Gress asked, "What does that mean? Did you do it?" Defendant answered, "Yes, I really screwed up this time." Defendant also said the police would not find his fingerprints on the gun.

As opposed to this evidence presented by the state, the defense consisted of a witness who could not identify defendant and a penitentiary inmate who purported to provide an alibi for defendant.

Carol Shoemaker lived at 5240 Windsor Island Road, near Muriel Bentson. At about 9:30 p.m. on February 25, 1986, she was driving past Bentson's house when she saw a man run in front of her car from Bentson's yard. She estimated the man was approximately six feet tall. She later saw a photograph of defendant taken after his arrest. She was sure he was not the same person she saw running from the victim's yard. She later saw defendant in person and concluded that he was not the man she saw at the scene.

David Oliver, a penitentiary inmate, testified that he first met defendant in Portland in 1980 or 1981. He later encountered defendant at the Oregon State Penitentiary when defendant was awaiting trial in the instant case. Defendant asked him if he could remember when they had been together in Portland in 1986. Oliver remembered it was "around February." Defendant asked if he could remember a specific night that they were together in Oliver's hotel room. Oliver remembered that it was a night the singer Kenny Rogers appeared on a television special that Oliver believed was the Grammy Awards. Defendant later told him the date of the television special was February 25.

Oliver testified that he was in downtown Portland at about 5:30 or 6 p.m. on the night of the television special when he saw defendant. Oliver was attempting to buy heroin because he was a regular user of the drug. Oliver took defendant to his hotel room, where Oliver injected heroin. Oliver and a girl staying with him left the hotel room about 8:05 p.m. Defendant walked with them to a bus stop, where they left him.

Defendant introduced the television section of the February 25, 1986, Statesman-Journal newspaper, which stated that the Grammy Awards were to be broadcast that evening at 8 p.m. and Kenny Rogers was to appear on the show. Joyce Hotel records indicated that Oliver was registered there from November 27, 1985, to March 6, 1986.

After hearing all the testimony and studying the exhibits in this case, the jury found defendant guilty of aggravated murder.

## ASSIGNMENT OF ERROR NO. 3

Defendant claims that the trial court erred in granting the state's motion to restrain defendant with security devices[5] during trial.

Defendant's argument on this issue is narrow. He does not claim that the trial court applied the wrong legal standard in deciding whether physical restraints were necessary, nor does he claim that the state failed to make a record below. All he argues is that the evidence does not support the trial court's decision. It does. The evidence disclosed that defendant threatened to kill the trial judge, counsel and various witnesses. It was sufficient to support the trial judge's conclusion that physical restraints were necessary.

The district attorney presented to the court six affidavits and a signed statement demonstrating the serious risk involved by leaving defendant unrestrained during trial. While in jail awaiting trial in this case, defendant threatened David Kominek, the police officer who arrested defendant and who would be one of the state's witnesses at trial, declaring that he would "get him." Moreover, defendant learned that Laura Cunningham, the sister of one of his friends, had given the police a statement. When Cunningham was visiting her brother in prison, she passed by defendant, who looked at her and threatened her, saying, "You're dead."

Finally, Michael Lissy, one of defendant's cellmates, stated:

---

[5] Defendant's hands were not restrained in any manner. The only restraint was a chain that joined two leg cuffs. Although the district attorney sought to have defendant conceal the leg cuffs under his trousers so that only the chain could be visible to the jury, defendant expressly chose to wear the cuffs on the outside of his trousers.

"[Farrar] also told me that he plans to do some sort of physical disruptions during the trial. He said he would find a way to do something. He's going to behave in court, however, coming and going to court is when he is going to do whatever it is he's going to do. He has never said anything about having any outside help in the particular aspect. Farrar has approached me and told me that if I could find somebody on the outside that I could trust to have kill Crawford, Kominek and Shockley, he in turn will do the same for me or do anything for me to get rid of these police officers. He has asked me to find someone to kill them. He wants this done prior to the trial date. He also has told me that after he gets out, or when he gets out, he's going to go and lay everybody down and kill them. *He plans to kill his attorneys, the judge, and the D.A.'s also that are involved in this case. He has made a list of priorities who he wanted dead before the trial. He has listed Melinda Ritchey (one of the state's primary witnesses) as the first person, then Crawford, Shockey, and Kominek and then the fence.* Farrar also has in later conversations told me to have Cliff and Denny (the mythical people I made up [who supposedly were going to provide Farrar with an alibi defense]) to go and rough the fence up and have the fence say that he got the jewelry from Knottnerus. Farrar, in talking about Melinda Ritchey indicates that Ritchey is a dumb bag bitch and stupid cunt. He also says he should have beat her more and he should have wasted her ugly ass. He also indicates that he's going to get her for testifying against him." (Emphasis added.)

In addition to present threats, defendant had engaged in a continuous course of violence before his arrest. Caroline Sedlacek stated that on March 9, 1979, defendant had tied her and her husband up, threatened them, and robbed them at gunpoint. Susan Geedy, defendant's former girlfriend, stated that "defendant came home one night and we got into an argument, and the defendant picked me up and threw me out of a second story window to the ground below." Geedy was paralyzed as a result of the fall and ultimately had to have one leg amputated.

Another woman, Wendy Marriner, had previously lived with defendant. Once when Marriner's two-month-old child was crying, defendant struck the baby's face and head, blinding the child for approximately one month. The state also submitted an affidavit of Martin Colwell, stating that

defendant "threatened [him] with bodily harm and forced [him] to perform oral sodomy on him."

The trial court did not abuse its discretion in concluding that, on this evidence, restraints were necessary. The trial court reasonably could have inferred that defendant posed an immediate and serious risk of danger and disruption or escape.

### ASSIGNMENT OF ERROR NO. 4

Defendant claims that the trial court erred in denying defendant's motion during jury selection to dismiss a juror for cause.

During voir dire of prospective jurors, one juror was called and examined at length by the parties and the trial judge. After some preliminary examination of the juror, defense counsel moved to excuse him for cause. Prior to ruling on the motion, the trial judge questioned the juror and determined that an insufficient basis existed to exclude him for cause. The prosecutor ultimately passed him for cause, but defense counsel renewed his challenge for cause.

Defendant acknowledges that he removed the juror thereafter from the jury panel through his use of a peremptory challenge. Consequently, the juror did not actually sit on the jury that was empaneled for trial. In the course of selecting the trial jury and the two alternate jurors, defendant did not exhaust his statutory allocation of 12 peremptory challenges. Defendant did not and does not argue that any member of the jury panel that actually decided his guilt should have been excused for cause. Moreover, he did not, does not, and cannot contend that his use of a peremptory challenge to excuse the juror forced him to accept a jury that he otherwise would not have accepted. Defendant fails to identify any prejudice that may have resulted from the ruling even if it were error. Defendant does not ask this court for any specific relief. He is entitled to none.

### ASSIGNMENT OF ERROR NO. 5

Defendant claims that the trial court erred in denying defendant's motion to suppress a photograph.

Part of the state's case was evidence that the killer wore a pair of gray Nike shoes which left imprints around and

in the victim's home. Melinda Ritchey testified that she gave a pair of Nike shoes to defendant at Christmas of 1985. She also established that defendant's shoe size matched the size of the imprints at the scene.

The police searched Ritchey's car after defendant's arrest and found a camera containing exposed but undeveloped film. One photograph on the film showed defendant wearing a gray tennis shoe that was similar to the shoes that left the imprints.

During opening statement, the prosecutor referred to the photograph. At the beginning of the second day of trial, defendant moved for a mistrial on the ground that the state had failed to provide the photograph in pretrial discovery. Alternatively, defendant moved to suppress the photograph.

The state provided many photographs to the defense. The challenged photograph was available to defendant with many others at the Keizer Police Department. It was never actually given to the defense, however.

Defense counsel conceded that any discovery violation was inadvertent rather than wilful. The trial court denied the motion for mistrial and the motion to suppress on the ground that the "discovery provided satisfies the statute."

ORS 135.815 establishes the scope of discovery the state is required to provide a defendant. ORS 135.815(4) provides:

"Except as otherwise provided in ORS 135.855 and 135.873, the district attorney shall disclose to the defendant the following material and information within his possession or control:

"* * * * *

"(4) Any books, papers, documents, photographs or tangible objects:

"(a) Which the district attorney intends to offer in evidence at the trial; or

"(b) Which were obtained from or belong to the defendant."

It is undisputed that the existence of the challenged photograph was discoverable under these statutes. The question presented here is whether the state complied with the

statutes by making the photograph available at the Keizer Police station in a group of other photographs after defense counsel had received many photographs associated with the case.

During pretrial discovery, the district attorney provided defendant with a list of all the photographs related to this case; one entry on this five-page inventory list was "photograph of Farrar in gray tennis shoes." The district attorney also provided defendant copies of these photographs, but inadvertently did not include several of the photos. Defense counsel, however, conceded that he indeed had received a photocopy of this particular photograph from the district attorney with the other discovery material. The photocopy was sufficient, there was no error.

## ASSIGNMENT OF ERROR NO. 6

Defendant next claims that the trial court erred in denying defendant's motion to exclude evidence of some gem stones seized from defendant after his arrest, because the evidence was not relevant to the guilt phase of the trial and was prejudicial because it was evidence of prior bad acts by defendant.

The prosecutor claimed the evidence of the gem stones was not for the purpose of showing any bad acts but solely to show Melinda Ritchey's basis of knowledge of intimate details about defendant's conduct and her accuracy in reporting these details. The prosecutor stated:

"[I]n introducing that evidence in the trial, there will be no mention that these were stolen gem stones in this phase. And our only purpose is to show that Ms. Ritchey did have such a close relationship with the defendant, she's testifying the defendant admitted that he killed in the course of a burglary, this crime, and she did have such a close relationship that she knew personal and intimate details such as the detail that he had these gem stones. And if placed in a situation where the police were after him, he would swallow them, very unusual act, very difficult act to do physically. And in fact, that statement of her's was corroborated by this evidence.

"We simply want to prove that everything she told the police was the truth. And that is part of the items she told the police, and immediately being contacted and immediately preceding the arrest of the defendant.

"We'll not mention that these gem stones are at all fruits of other burglaries. Simply that he had them, she predicted this and gave us personal information about the defendant. And that personal information prediction was corroborated by the physical evidence. That's the relevancy of it."

Detective Kominek and Sergeant Putnam testified that when the police x-rayed defendant pursuant to a search warrant, they discovered two gem stones in his intestinal tract and that they placed defendant in an isolation cell until they could recover these gem stones. Melinda Ritchey testified that defendant told her that if he were arrested, "he would swallow them so he could keep them." Neither during examination of the witnesses nor in closing argument did the prosecutor claim that the gem stones were stolen or tied to any prior bad act.

Evidence that defendant swallowed two gem stones immediately before the police arrested him, just as Melinda Ritchey said he would, was marginally relevant to demonstrate Ritchey's basis of knowledge of intimate details about defendant. The relevance of Ritchey's knowledge of defendant's intended acts at time of arrest, however, did not tend to prove any issue in the case, *see* OEC 401, and should have been excluded.

Nevertheless, the brief reference to gem stones was in no way pivotal in this prolonged five-week trial. A jury would not place much significance on such evidence considering the main issue in this case: Did this defendant break into the victim's home to commit a burglary and end up shooting her five times after assaulting and robbing her, or was this defendant in Portland at the time? The presence or absence of gem stones in his belly at time of arrest had nothing to do with the main issue, and it would not have influenced the jury or directed their attention from the issue at hand.

There was no need to offer this questionable evidence. Any error, however, could not have been prejudicial. *See State v. Mains,* 295 Or 640, 669 P2d 1112 (1983).

## ASSIGNMENT OF ERROR NO. 7

Defendant claims that the trial court erred in denying his motion for a mistrial after a state's witness mentioned that he had taken a polygraph examination.

The following colloquy occurred during the cross-examination of state's witness Rick Lancaster:

"Q. [DEFENSE COUNSEL]: Mr. Lancaster it's correct it's been over a year since you talked to the police last; is that correct?

"A. Not since I talked to the police, but since the day we drove by the house and Steve said that, it's been over a year, yeah.

"Q. When is the last time, sir, that you talked to the police?

"A. Excuse me?

"Q. When is the last time you talked to the police about this matter?

"A. Pertaining to this case, it's probably been a couple months, three months.

"Q. You've gone over — you made a taped statement to the police, did you not?

"A. Yes, I did.

"Q. Way back in '86. Have you gone over that statement with the police or with the District Attorney's Office or —

"A. Yes. We went over roughly the same questions that were asked during the lie detector test and during tapings that they took at Keizer Police Station.

"Q. Um-hum. Did — at any time — now, you've testified truthfully to the police or talked to the police truthfully each time; is that correct?

"A. Yes.

"Q. Initially, were you lying to the police when they first started asking you about this crime?

"A. As to if I knew Steve Farrar, yes. I said I knew him vaguely which I did know him better than vaguely.

"Q. Did you tell the police any other lies?

"A. No, sir.

"[DEFENSE COUNSEL]: May we approach the bench, Your Honor?

"* * * * *

"(Whereupon, the following proceedings were had out of the presence of the jury, to-wit:)

"[DEFENSE COUNSEL]: Your Honor, I must make a motion for a mistrial based upon the witness's clearly improper statement contrary to our Motion in Limine regarding the lie detector.

"* * * * *

"[PROSECUTOR]: Your Honor, the reference was had he gone over his prior statements and questions the police had asked him. And we have instructed all witnesses not to refer to polygraph tests. But, uhm, that particular reference was innocuous in its context and simply said I've gone over statements I made at these different times. There was no stop or comment. There was nothing to buttress or emphasize that point. Simply a matter of fact, yeah, I went over the same questions that I'd gone over at other times with the police. Nothing mentioned about the results or that type of thing.

"And I believe that it's — certainly, if the defense would request some kind of limiting instruction about it, that would be appropriate. I don't feel it's raised to the level to require a mistrial.

"THE COURT: I'll deny the motion. I'll give a cautionary instruction if the defense wants it. Everybody knows, of course, when you give a cautionary instruction, it calls attention to it.

"But I frankly thought that the reference, while technically improper I guess under our prior proceedings, was innocuous as Mr. Penn has characterized it. It was just in passing; there was no indication as to what the tests showed, so —

"* * * * *

"[DEFENSE COUNSEL]: I would accept a curative instruction that the fact that the stipulation on the part of the police that Mr. Lancaster took a lie detector test and was found to be deceptive on two of the questions. If the Court would inform the jury of that, we'd be prepared to go ahead.

"* * * * *

"[THE COURT]: I'll decline to give the requested curative instruction if that's what it's supposed to be or if that's what it's properly labeled.

"* * * * *

"I am inclined to say at this stage of the trial that the ruling of the Court will stand. The motion for mistrial will be

denied, and no curative instruction will be given to call further attention to the area."

██ ██ Although bringing before the jury the fact that some material witness submitted to a polygraph examination and achieved some particular result can be reversible error if the evidence is offered to undermine, buttress or rehabilitate that person's credibility, *see State v. Lyon,* 304 Or 221, 744 P2d 231 (1987); *State v. Foster,* 296 Or 174, 674 P2d 587 (1983); *State v. Snider,* 296 Or 168, 674 P2d 585 (1983); *State v. Eby,* 296 Or 63, 673 P2d 522 (1983); *State v. Middleton,* 295 Or 485, 668 P2d 371 (1983), that is not the issue in this case. Here, the state did not offer the results of a polygraph examination; rather, a witness mentioned a "lie detector test" in response to a question asked by defense counsel on cross-examination. The reference did not warrant a mistrial because it was isolated and made only in passing, the results of the test were not disclosed, and the state never argued that the test had any significance to the witness's credibility or to any other issue in the case.

A motion for mistrial is "addressed to the sound discretion of the trial judge," who is in the best position to assess and to rectify the potential prejudice to the defendant. *See, e.g., State v. Jones,* 242 Or 427, 433, 410 P2d 219 (1966); *State v. Hoffman,* 236 Or 98, 107-08, 385 P2d 741 (1963). In this case, the trial judge personally observed Lancaster's testimony on direct and cross-examination and, at the point the "lie detector test" comment was made, had heard the state's entire case-in-chief. The trial judge concluded that, in context, Lancaster's brief and isolated mention of the "lie detector test," although "technically improper," was merely "in passing" and "innocuous," and was not prejudicial because "there was no indication as to what the tests showed." We find no error in the trial judge's discretionary ruling.

## ASSIGNMENT OF ERROR NO. 8

██ In this assignment of error, defendant claims that the trial court erred in denying defendant's motion for mistrial during the state's closing argument in the guilt phase.

During his initial argument at the end of the guilt phase of the trial, the prosecutor argued that the testimony of David Oliver was not credible. The following occurred:

"[PROSECUTOR]: But even more than that, does it make sense? Does it violate your own common sense that this story that Mr. Oliver in the penitentiary in June of 1986 now sees his old buddy, the defendant. Only seen each other on February 25th and then back in 1980, '81. We know that's a lie. But he sees his old buddy. And now he knows his old buddy has been indicted for Aggravated Murder; but not just that, he's facing the death penalty.

"Well, does the defendant say all right, you know, I've got my alibi witness, they made a mistake. Let me go send that to the Grand Jury or let me send that to the District Attorney; show them that this — they made a mistake. Did they do that?

"Didn't do it in June, didn't do it in July, didn't do it in August, didn't do it in September. And you remember, Mr. Oliver got kind of angry; I didn't do it the rest of the month either.

"[DEFENSE COUNSEL]: Excuse me, Your Honor. I must object to Mr. Penn. Mr. Penn has essentially accused the defendant of not telling the police there was mistake. He basically has held the defendant's right to remain silent up for ridicule.

"The defendant by exercising his right to not communicate to the police is in no way guilty of anything. The inference that the defendant failed to talk to the police is grounds for an instruction and would make a motion outside the presence of the jury.

"THE COURT: Sustain the objection to that sort of argument if that's what you're arguing, Mr. Penn.

"[DEFENSE COUNSEL]: And I have a motion to make outside the presence of the jury as a result of that argument, Your Honor.

"THE COURT: I'll note that; take it up at recess."

The following occurred at the end of the prosecutor's argument:

"THE COURT: [Defense counsel], you have a matter for the record?

"[DEFENSE COUNSEL]: Your Honor, I must make a motion for mistrial based upon Mr. Penn's unconscionable and improper argument. Mr. Penn has essentially rubbed the 5th Amendment in the defendant's face in front of the jury.

There is no corrective instruction, curative instruction that can cure that.

"I think the law is clear that a defendant cannot be accused of a crime for his silence. Mr. Penn said if the defendant was innocent, why did he not come forward, why did he not talk to the police, why did he not talk to the Grand Jury? Mr. Penn knows this type of error is so prejudicial that it cannot be corrected by any instruction.

"Consequently, we're seeking a mistrial. I believe we're thoroughly supported in the law of the cases that has granted mistrials for that kind of improper argument.

"[PROSECUTOR]: Your Honor, my argument was specifically in judging the credibility of David Oliver and that the jury should take into account their own common sense and their experiences in life.

"And that the story that Mr. Oliver was telling them was that he had this information as of June, 1986 and that was his testimony. And on cross-examination without any objection, he admitted that he had not given this information to anyone until January of 1987.

"And that is a circumstance and that is available for the jury in judging whether or not they believe Mr. Oliver and as part of their own common sense in judging that.

"I did not specifically state the defendant did not do these things. I said Mr. Oliver was there and talked to the defendant and knew that the defendant was charged with murder, which again — and was facing the death penalty which again was his testimony on cross-examination and on direct examination.

"And I was simply drawing for them that ability to judge the testimony of Mr. Oliver based upon their common sense; that it does not make sense that he would not present that to anyone until January of 1987 if in fact it was true.

"THE COURT: I'll deny the motion for mistrial. Defense wants an instruction regarding defendant's right to not present evidence or to come forward, you can request that and it will be [included] in or added to the jury instructions at the conclusion of the trial."

Defendant either declined or failed to request a cautionary instruction.

In *State v. White,* 303 Or 333, 341-42, 736 P2d 552 (1987), this court stated:

"Where a prosecutor has introduced evidence of a defendant's invocation of the right to remain silent, this court has stated the following rule:

" 'There is no doubt that it is usually reversible error to admit evidence of the exercise by a defendant of the rights which the constitution gives him *if it is done in a context whereupon inferences prejudicial to the defendant are likely to be drawn by the jury.*'

"*State v. Smallwood,* 277 Or 503, 505-06, 561 P2d 600 (1977)." (Emphasis added.)

In *White,* the prosecutor "deliberately chose to offend the rules," and his comments to the trial court made it clear that his precise intent was to "put to the jury defendant's exercise of his right to remain silent." 303 Or at 341. In contrast to *White,* here the prosecutor's inadvertent reference to defendant, rather than Oliver, was not "likely to prejudice the defendant's right to a fair trial," given the context in which the statement was made. The focus of the prosecutor's argument, both immediately before and after the objectionable comments, was to attack Oliver's credibility and Oliver's failure until January 1987, to tell anyone that he had been with defendant on the night of Muriel Bentson's murder. The prosecutor properly cross-examined Oliver on this topic and properly commented on it in closing argument.

The trial judge, who was in the best position to assess the impact of the district attorney's comment on the jury, expressly concluded that the remark was not prejudicial to defendant. We will not disturb that conclusion. Obviously, the comment was a non-prejudicial slip of the tongue.

## ASSIGNMENT OF ERROR NO. 9

Defendant claims that the trial court erred in refusing to give defendant's requested instructions on the lesser included offense of murder.

Defendant was charged with four separate counts of aggravated murder, all arising out of the same incident: (1) murder during a robbery; (2) murder during a burglary; (3) murder to conceal the identity of the robber; and (4) murder to conceal the identity of the burglar. No lesser offenses were charged. The case went to the jury on all four counts of aggravated murder. Defendant does not contest the sufficiency of

the instructions on the aggravated murder counts, nor does he contend that they were incorrect statements of the applicable law. No instructions were given on any lesser offense, and the verdict form did not request a jury finding on any crime other than aggravated murder. The jury returned a verdict finding defendant guilty of all four counts of aggravated murder. Defendant's entire argument is that "[t]he jury could have concluded that defendant murdered the victim, but that the killing did not come within any of the [four] alleged aggravated categories."

This court recently addressed the issue of lesser included instructions in *State v. White,* 303 Or 333, 347, 736 P2d 552 (1987), and reaffirmed its prior holdings that ORS 136.465 requires evidence from which a jury "could rationally find guilt of a lesser offense and no guilt of the offense charged." The evidence in this record does not rationally support a verdict of guilty of simple murder and an acquittal on the aggravated murder charges. We cannot conceive of any coherent reason for giving the lesser included instruction on simple murder. The entire case was founded on a murder committed during a burglary of the victim's home and a robbery of the victim. On this record the jury could not have rationally found that the killing was unrelated to any of the four categories.

There was no violation of statute or state or federal constitutional rights in the trial court's refusal to give the lesser included instruction.

## PENALTY PHASE

### Facts

#### 1. State's case

Defendant committed residential burglaries in the Salem area on most of the days that he and Ritchey lived together. They obtained money to rent an apartment from a residential robbery that defendant committed with Kenny Taylor. Six Salem residents described burglaries at their residences in 1985-86, in which the gem stones, other jewelry, cash and a VCR were taken.

Naomi Christenson was an elderly woman who lived in Salem with her husband. During the evening of January 13,

1986, two masked men entered their house and knocked them to the floor. The intruders bound the Christensons and threatened to shoot them. They then ransacked the house, took cash and other valuables and fled in the Christensons' car. There was evidence that defendant and Taylor committed this robbery.

Susan Geedy met defendant in Massachusetts in 1974 when they were both 17 years old. They began living together in a second-story apartment in May of that year. She and defendant got into an argument one night, and defendant threw her out of a window in their apartment. Geedy landed on concrete and suffered a broken back. Defendant took her to the hospital, where she was operated on three times and placed in a body cast. She did not tell anyone how she was injured, because defendant threatened to kill her if she did. Geedy could not move while she was in the cast, but she continued to live with defendant. Defendant beat her on a number of occasions. He stabbed the cast with a knife, and it had to be replaced. On one occasion, defendant smashed her head against a bathroom sink and pointed a shotgun at her and told her "to pick either side of the gun to see what side the bullet was on." Defendant used her Social Security Disability checks for his own needs, including the purchase of a car. Geedy did not report any of these incidents, because defendant threatened to kill her and her grandmother. She finally moved away from six to nine months after her back injury.

Wendy Marriner began living with defendant in 1975, when she was 15 years old. Defendant fathered her two children, a boy and a girl. On February 18, 1978, defendant and Marriner were living in Colorado and their daughter was three months old. Marriner and defendant got into an argument because the baby was crying. At about 3 a.m., Marriner awoke and heard the baby screaming. She went to the bathroom and found defendant holding the baby and hitting her with his fists. He threw the baby down and began beating Marriner. He said he would kill her if she called anyone. Marriner took the baby to a hospital. The child suffered a skull fracture and was blind for about a month.

Defendant beat Marriner "almost on a regular basis" during their three-year relationship. He also threatened to

blow up her parents' house. He only worked for about two months during the relationship.

In March 1979, defendant and another man entered the home of Caroline and Earl Mummert in Colorado Springs, Colorado. Mr. Mummert was 84 years old at the time. The intruders tied, gagged and blindfolded the Mummerts and ransacked the house for about six hours. They left the victims bound in a bedroom when they left the house. Defendant and his partner committed a second, similar residential robbery in Colorado Springs two days later. Defendant confessed to committing the robberies after he was arrested several months later. He said he was armed with a handgun on both occasions. He subsequently pled guilty to committing these crimes.

In May 1979, defendant and some other men committed a residential burglary in Tillamook. They were apprehended a short distance from the scene. Although defendant initially told the police he was not involved in the burglary, he subsequently pled guilty to the charge.

Defendant was incarcerated in a county jail in Colorado in January 1980. Martin Colwell was placed in a cell next to defendant's cell. Defendant pled guilty to forcing Colwell to commit oral sodomy on him.

In 1982, defendant pled guilty to two separate charges of being an ex-convict in possession of a concealable firearm.

On July 15, 1986, defendant was in the Marion County jail awaiting trial in the present case when he encountered Detective Kominek. Defendant began yelling obscenities at the detective, said he was a liar and that he was going to "get" him.

Laura Cunningham was visiting her brother at the Oregon State Correctional Institute after defendant's arrest, when defendant walked by her and said, "You're dead."

### 2. Defendant's case

Alice Shannon is a psychiatrist who works at the Oregon State Hospital. She testified that psychiatrists cannot predict violent behavior by an individual "with any accuracy." She did not believe that the prediction required by the second special death penalty question could be made "with any degree of scientific accuracy."

Defendant's sister, Cynthia Farrar Wellman, lived in Maine and was unable to attend the trial. The parties stipulated she would have testified as follows:

"[THE COURT]: Now, let me note for the jury one explanatory thing; and that is that there is a reference in this stipulated testimony to a Bulah Farrar. And you're advised that she's the paternal aunt of the witness Cynthia Farrar Wellman and of the defendant. And that is just a matter of clarification or identification for you as to what this stipulated testimony is about.

"Now, with that, you may take this as the stipulation that this is the testimony Cynthia Wellman would give if she were called as a witness here.

"That she was born on October 21, 1955. She's approximately two years old[er] than her brother Steven. Her father is now retired and his name is Steven Longfellow Farrar. Her father was a floor sander by trade and worked in the Boston area when they were small children.

"Her mother's name was Carlene Farrar and was a homemaker. She suffered from multiple sclerosis which she died of approximately five years ago. Her mother's illness was progressive. She at times would be in remission; and at other times, the disease would be manifested by loss of urinary control, culminating in a catheter being surgically implanted for urinary functions.

"She also progressively lost muscle control and had to be held to walk or move. This degeneration took from Cynthia's first memories of her mother when she was three or four years old until she died in a nursing home.

"Their father was mentally ill from Cynthia's ʻearliest memories. She describes him as being either extremely hyper or up to being really down within the space of a short period of time. She describes numerous admissions to VA mental hospitals. She describes him as currently on Melaril.

"To her own knowledge, she knows that her father has been diagnosed as a schizophrenic and manic depressive. She describes both of her parents as individuals who could not deal with stress. For her mother, the stress exacerbated her MS and symptoms. To her father, the stress and any responsibility exacerbated his mental illness.

"When — well, she describes her father as a hard worker. Several times Cynthia herself and at times with the help of her Aunt Bulah had to intervene with violent outbursts by her

father. These times would end up with them contacting the authorities and the authorities taking the father to the mental hospital.

"Most of the time, the mental illness of the father manifested itself with outbursts of anger that contained outbursts of violence directed at objects, such as the house or furniture.

"Both Bulah and Cynthia remember a particular time when her father threw a television out the window and destroyed other household property. Cynthia describes incidents when her father would hit her mother and her brother but these were the exception and not the rule.

"From her earliest memory of her brother, she remembers only that he had the disease named precocious puberty. She remembers this as being as young as when he was one year old. She remembers her brother being in and out of Massachusetts General Hospital, and Children's Hospital in Boston, Massachusetts, many times. He was always bigger than his peers from when he was one until he stopped growing when he was ten. At the age of five, he looked like a ten-year-old. At six, he was of adult stature.

"Steve and Wendy's son, Stephen Farrar, Skipper, also suffers from this condition. He's currently ten years old and is over 6 feet tall.

"Stephen's condition added to the stress in the family and the mother got sicker and the father less stable. At this time, the family was living in Dorchester, Massachusetts, a close-in suburb of Boston. The family fell apart. Cynthia was sent to Maine to live with a grandmother and Steven was in and out of medical hospitals, foster homes, and juvenile schools for being a runaway as well as criminal activity.

"He was asked to leave school in kindergarten or first grade because he was physically bigger than his peers. [Fourteen] years ago the mother moved to Maine to be taken care of by her relatives. She died in a nursing home in Maine.

"* * * * *

"* * * Both Bulah and Cynthia know directly of four suicide attempts by Steven. The first being when he was 15 or 16 and did not want to go back to the foster home that he was living in. He overdosed on Bulah's prescription medication and almost died.

"Cynthia remembers her brother between the ages of five and ten becoming hard and tough, specifically after he was sent to several institutions. * * *

"* * * * *

"Cynthia knows that Stephen did not learn how to read and write until his years in Oregon prison system when he got his GED. He did attempt to read and write earlier and had picked up a basic knowledge of these skills when he was a teenager. Cynthia remembers receiving letters from him after he and Wendy left Maine to go on their trip to Florida and Colorado.

"These letters were rudimentary at best with only the basic concepts being communicated. His letters improved dramatically after he received his GED.

"Cynthia remembers her brother being put in 6th grade in Maine because of his size and not his age or the work he was capable of doing. She remembers his frustration with his home work because he did not know enough to do it. She does not know his IQ and does not consider him intellectually mentally retarded.

"She would describe his intelligence as normal and the fact is she says he has an aptitude for art and was asked to do some art for the Massachusetts General Hospital when he was nine years old."

Defendant was 29 years old at the time of trial. He testified he had a "growth problem" when he was a child that caused him to be much bigger than other children the same age. His mother suffered from Multiple Sclerosis and his father was "in and out" of veterans' hospitals during defendant's childhood. Defendant estimated he was committed to between six and eight reform schools or foster homes before the age of ten. He continually ran away from these institutions and attempted to survive on his own by stealing things and meeting people who would help him.

Defendant's longest period of employment was when he worked with his father sanding floors between the ages of 8 and 13. His formal education stopped at the fourth or fifth grade level. He later obtained a GED while he was incarcerated in Oregon in 1980. He had attempted to commit suicide a few times. He was a long-time drug abuser who had "done them all."

Defendant testified that he and Geedy were "pretty stoned" on LSD and marijuana on the day she injured her back. He denied throwing her out the window. Rather, he

jumped off to a second floor ledge and then dared her to follow. Geedy jumped, but fell back on the sidewalk and hurt her back when she landed. They both decided to buy the car with her disability checks. He and Geedy had many arguments, but he did not beat her.

## ASSIGNMENT OF ERROR NO. 10

Defendant moved to limit the introduction of a number of unadjudicated crimes and bad acts he had allegedly committed since the age of 15. He argued that the provisions of the Oregon Evidence Code should apply to the sentencing phase of a capital trial, and that the evidence should have been excluded because it was not relevant or that any probative value was far outweighed by the prejudice to the defendant. Defendant additionally objected to some of the evidence, including some prior convictions, on the ground that the incidents occurred so long ago that they were not relevant to the issues in the penalty phase.

The trial court admitted the evidence on the ground that the aggravated murder sentencing statute, ORS 163.150, permits the introduction of all prior bad acts of a defendant, if the state attempts to prove that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

In the instant case, defendant objected on relevancy grounds to testimony about unadjudicated crimes and bad acts by the following witnesses: Melinda Ritchey (Salem burglaries and robbery); Margaret Forsythe (Salem residential burglary); Naomi Christenson (Salem residential burglary); Ardith Latham (Salem residential burglary); Everett Holmes (Salem residential burglary); Wanda Hoffman (Salem residential burglary); Susan Geedy (Massachusetts assaults, threats); David Kominek (Salem jail threat); Laura Cunningham (Salem prison threat) Wendy Marriner (Maine assaults, bad acts on trip to Colorado, beatings and threats).

In addition, defendant objected to testimony by the following witnesses on the ground the events were too remote to be relevant: Susan Geedy (1974 incidents); Caroline Sedlacek (1979 Colorado robbery); Delmar Wedge (1979 Colorado robberies); Martin Colwell (1980 Colorado sodomy); Wendy Marriner (1975-78 Maine and Colorado incidents).

These "bad" acts were properly admitted in evidence in the penalty phase. They were relevant to help resolve the issue of defendant's future dangerousness. *State v. Wagner,* 305 Or 115, 178, 752 P2d 1136 (1988), *judgment vacated and remanded* 492 US ___, 109 S Ct 3235, 106 L Ed 2d 583 (1989), *on remand* 309 Or 5, 786 P2d 93 (1990). The trial court did not err in admitting evidence of the prior acts objected to by defendant.

## ASSIGNMENT OF ERROR NO. 11

Defendant moved for a mistrial based on prosecutorial misconduct during rebuttal argument in the penalty phase. The motion was denied.

The following occurred during the prosecutor's rebuttal argument:

"[PROSECUTOR]: Mr. Gorham talked a little bit about society and the threat or the danger that Mr. Farrar poses to society. I would submit these questions need to be answered today, basically today as you're seated here in Court and as you look at the defendant who's seated here in Court; is there a probability that he'll commit criminal acts of violence that constitute a continuing threat to society? That question needs to be answered today. And you'll see that there's really no definition as to what society is, so you're going to have to use your own common sense in deciding that.

"But the word[s] free society — the word free isn't in front of the word society. It doesn't exclude prison populations. Martin Colwell is a classic example of that. He was in the El Paso County Jail when he became the victim of Mr. Farrar. And Mr. Gorham says well, where Mr. Farrar is going there are no Martin Colwells, but how do we know that? How do we know who's going to commit a crime tomorrow and be sent out there and whether they're going to be like Martin Colwell and someone else.

"You can't assume there will never be another Martin Colwell in Mr. Farrar's life. Then, of course, you're all aware there are guards, there are staff members.

"* * * * *

"[PROSECUTOR]: Thank you, Your Honor. And all those people are also members of our community and society. And they're members that are in prisons and subject to actions by inmates. All these people are part of society and in fact are recognized by society in the form of laws governing

assaults, arsons, drug charges, possession of weapons, all these our society recognizes and prosecutes people whether it's inmate on inmate or inmate on guard; we recognize that as part of our society."

Future dangerousness applies to everyone. Prison personnel are not exempted. In accord, *see Brooks v. Kemp,* 762 F2d 1383 (11th Cir 1985), *vacated and remanded on other grounds* 478 US 1016, 106 S Ct 3325, 92 L Ed 2d 732 (1986). The danger to prison guards and their families is a proper argument because the future dangerousness of a defendant is a proper inquiry. *See Campbell v. Kincheloe,* 829 F2d 1453, 1457-58 (9th Cir 1987), *cert den* ___ US ___, 109 S Ct 280, 102 L Ed 2d 369 (1988). The comment was not error.

## ASSIGNMENT OF ERROR NO. 12

██ ██ In assignment of error No. 12, defendant claims that the trial court erred in failing to give each of defendant's requested instructions on mitigating circumstances.

Defendant requested the following separate instructions on mitigating circumstances:

"The defendant should be allowed any and all aspects of defendant's life as mitigating factors."

"The jury may bring back a life sentence even if no mitigating circumstances are found."

"A mitigating circumstance need not be proved beyond a reasonable doubt by the defendant. If you are reasonably convinced that a mitigating circumstance exists, you may consider it as established."

"The death penalty is warranted only for the most aggravated and unmitigated of crimes. The law does not require that death be imposed in every conviction in which a particular set of facts occur. Thus, even though the factual circumstances may justify the sentence of death by lethal injection, this does not prevent you from exercising your reasoned judgment and returning a verdict of life imprisonment."

As we have stated this date in *State v. Wagner, supra,* consistent with the the United Supreme Court's decision in *Penry v. Lynaugh,* 492 US ___, 109 S Ct 2934, 106 L Ed 2d 256 (1989), and ORS 163.150, in a death penalty case the trial judge must instruct the jury on a fourth question on the subject of mitigation, if constitutionally required. The trial court

failed to give such an instruction. The holding in *Wagner* requires that this case be remanded to the trial court for retrial of the penalty phase only, consistent with the procedures set forth in that opinion.

We disapprove defendant's second requested instruction that "the jury may bring back a life sentence even if no mitigating circumstances are found." As a minimum, we approve in substance defendant's first and third requested instructions, as follows:

> "You may consider any aspect of defendant's life in your determination on the fourth question and any aspect of defendant's life that may be relevant in your determination of the first three questions."

> "Defendant need not prove the existence of a mitigating circumstance beyond a reasonable doubt. If you reasonably believe that a mitigating circumstance exists, you may consider it as established."

Additionally, pursuant to our opinion this date in *Wagner,* during the penalty phase the trial court must instruct each juror on the four issues set forth in ORS 163.150(1)(b), which statutory instructions may (but need not) read as follows:

> 1. Was the conduct of the defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that death of the deceased or another would result?

> 2. Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society? In determining this issue, you shall consider any mitigating circumstances offered in evidence, including, but not limited to, the defendant's age, the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed.

> (If raised by the evidence) 3. Was the conduct of the defendant in killing the deceased unreasonable in response to the provocation, if any, by the deceased?

> 4. Should defendant receive a death sentence? You should answer this question 'no' if you find that there is any aspect of defendant's character or background, or any circumstances of the offense, that you believe would justify a sentence less than death.

If any juror votes "no" on any of the four questions, the death penalty may not be imposed, because a sentence of death by a jury must be unanimous.

## ASSIGNMENT OF ERROR NO. 13

 In this assignment of error, defendant contends that the trial court erred in failing to give the following requested instructions during the penalty phase:

> "The law presumes that the accused will not commit criminal acts of violence in the future. That presumption follows the defendant unless and until the probability of the commission of such violent criminal acts is proven beyond a reasonable doubt."

No such instruction was required or should have been given.

Defendant argues that a presumption of "peacefulness" is an extension of the presumption of a criminal defendant's innocence. The "presumption of innocence" in the guilt adjudication phase is simply a traditional way to allocate the burden of proof; it is not an evidentiary presumption in a true sense. The court did not err in not instructing the jury on this issue.

## ASSIGNMENT OF ERROR NO. 14

 Defendant claims that the trial court erred in failing to give defendant's requested instruction concerning the second statutory question, Defendant requested the following instruction:

> "In determining the issue of whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, you are to consider mitigating circumstances offered in evidence, including, but not limited to:
>
> "(1) The defendant's age;
>
> "(2) The evidence that the likelihood of violence diminishes as one becomes older;
>
> "(3) Evidence that violence is situational;
>
> "(4) The defendant's family environment in his youth;
>
> "(5) [sic]
>
> "(6) Evidence of the degree to which you find that the defendant suffers from alcoholism or drug addiction."

Defendant acknowledges that his requested instruction paralleled the statutory formulation on mitigating evidence. ORS 163.150(1)(b)(B) provides:

"Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"* * * * *

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. In determining this issue, the court shall instruct the jury to consider any mitigating circumstances offered in evidence, including, but not limited to, the defendant's age, the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed[.]"

The trial court's instruction on this point repeated the statutory language:

"In determining this issue, you're to consider any mitigating circumstances received in evidence, including but not limited to defendant's age, the extent and severity of defendant's prior criminal conduct, and the extent of the mental and emotional pressure under which the defendant was acting at the time the killing was committed."

Defendant claims that it is well-documented that many juries have difficulty in understanding pattern jury instructions in both the guilt and penalty phases. *See, e.g.,* Severance, Greene & Loftus, *Toward Criminal Jury Instructions That Jurors Can Understand,* 75 J Crim L & Criminology 198 (1984). Thus, defendant claims, his requested instruction, which included specific categories, was necessarily more reliable than the court's general instruction.

But defendant fails to give any basis for the court to take judicial notice that violence lessens with age, that violence is situational, or to make specific comment on the evidence about defendant's family or drug abuse. If the court had done so, the court would have erred. The trial court did not err in refusing to give defendant's requested instruction.

### ASSIGNMENTS OF ERROR NOS. 16-19

In assignments of error Nos. 16-19, defendant raises a number of new issues not decided in *Wagner.* Because they are

so scattered and difficult to separate, we shall address them in (A) to (H) order.

A. *The indictment failed to state offenses and the allegations were not definite and certain—Counts I and III failed to plead the culpable mental state of "intentionally" for the underlying crime of robbery in the first degree.*

The four-count indictment alleged that defendant committed two counts of aggravated felony murder, ORS 163.095(2)(d), and two counts of aggravated murder by concealment, ORS 163.095(2)(e). Counts I and III were based upon the underlying commission of robbery in the first degree.

Count I alleges that defendant personally and intentionally killed Muriel Lucille Bentson while intentionally committing a first degree robbery in which he *knowingly* used physical force, and possessed and used a deadly weapon.

Count III alleges that defendant caused the death of Bentson while intentionally trying to conceal the identity of the perpetrator of a first degree robbery, in which defendant *knowingly* used physical force, and possessed and used a deadly weapon.

Defendant's challenge is based upon ORS 135.630(4)[6] and Article I, section 11, of the Oregon Constitution (right to demand the nature of the cause of the accusation).

Defendant objects to the robbery elements alleged in Counts I and III; in particular, he focuses on the element of the use of physical force during the robbery. Defendant contends that the state alleged that defendant knowingly used physical force and that the relevant statutes require intentional use.

ORS 164.395 pertinently defines robbery in the third degree as follows:

"(1) A person commits the crime of robbery in the third degree if in the course of committing or attempting to commit

---

[6] ORS 135.630(4) provides:

"The defendant may demur to the accusatory instrument when it appears upon the face thereof:

"* * * * *

"(4) That the facts stated do not constitute an offense[.]"

theft the person *uses* or threatens the immediate use of *physical force upon another person with the intent of:*

"(a) *Preventing* or overcoming *resistance to the taking of the property* or to retention thereof immediately after the taking[.]" (Emphasis added.)

ORS 164.415 defines robbery in the first degree as the violation of ORS 164.395 while armed with a deadly weapon. Thus, the statute defining robbery in the third degree requires a specific intent for the element of use or threatened use of physical force in preventing or overcoming resistance to the theft.

The indictment at Counts I and III pertinently alleged that defendant did

"intentionally [Count I: commit] [Count III: to conceal the perpetrator of] the crime of Robbery in the First Degree With a Firearm, to-wit: the defendant * * * did * * * unlawfully, feloniously and knowingly use physical force upon Muriel Lucile Bentson * * * with the intent of preventing resistance to the said defendant's taking of the said property * * *."

The indictment clearly complies with the express terms of ORS 164.395 and ORS 164.415. The use of the term "knowingly" does not supersede or alter the greater allegations that the crime was committed "intentionally" and that the use of physical force on the victim occurred "with the intent of preventing resistance." This assignment of error has no merit.

B. *Vagueness challenges to ORS 163.095(2)(d) and (2)(e)*

Defendant argues that the two relevant sections of the aggravated murder statute, namely ORS 163.095(2)(d) (hereafter referred to as "aggravated felony murder") and ORS 163.095(2)(e) (hereafter referred to as "aggravated murder by concealment"), are impermissibly "vague" and in violation of the state constitutional protections of fair notice (Art I, § 11), proportionality (Art I, § 16), privileges and immunities (Art I, § 20), and the prohibition against *ex post facto* laws (Art I, § 21). He also alleges that the statutory provisions violated the vagueness, due process, equal protection, and privileges and immunities guarantees of the Fourteenth Amendment to the United States Constitution. Defendant specifically claims that ORS 163.095(2)(d) and

(2)(e) are facially vague and that they cannot be saved by judicial construction. We hold that they are not facially vague and require no judicial construction.

This court restated the "vagueness" standard in *State v. Graves*, 299 Or 189, 195, 700 P2d 244 (1985), as follows:

"The terms of a criminal statute must be sufficiently explicit to inform those who are subject to it of what conduct on their part will render them liable to its penalties. *State v. Hodges*, 254 Or 21, 27, 457 P2d 491 (1969). In addition to its function of giving fair notice of the forbidden conduct, [a] criminal statute must not be so vague as to permit a judge or jury to exercise uncontrolled discretion in punishing defendants, because this offends the principle against *ex post facto* laws embodied in Article I, section 21, of the Oregon Constitution. *Id.* The equal privileges and immunities clause is also implicated when vague laws give unbridled discretion to judges and jurors to decide what is prohibited in a given case, for this results in the unequal application of criminal laws. *See State v. Robertson*, 293 Or 402, 408, 649 P2d 569 (1982). A criminal statute need not define an offense with such precision that a person in every case can determines in advance that a specific conduct will be within the statute's reach. However, a reasonable degree of certainty is required by Article I, sections 20 and 21." (Footnote omitted.)

*See also State v. Cornell/Pinnell,* 304 Or 27, 30-31, 741 P2d 501 (1987).

ORS 163.095(2)(d), read in conjunction with ORS 163.115(1)(b), provides that a person commits aggravated felony murder if he personally and intentionally kills "in the course of and in furtherance of the [felony that] the person is committing or attempting to commit, or during immediate flight therefrom * * *." Defendant argues:

"ORS 163.115(1)(b) is unduly vague, because it appears to expand the reach of the felony murder statute beyond the scope of acts constituting the commission or attempted commission of the specified felonies to apparently include killings occurring *preceding* the substantial steps of an attempted felony (i.e., 'in furtherance of') and to apparently include killings occurring *after* the completed felony or *after* the attempted felony (i.e., during immediate flight therefrom)." (Emphasis in original.)

■ The short answer to defendant's argument is that the murder at issue here allegedly occurred *during* the felony — not that it preceded the killing or that the killing occurred during "immediate flight therefrom." It therefore fell squarely within the statute's prohibitions. Defendant's abstract concern about how the statute might be applied to others is irrelevant to the validity of his own conviction. *See State v. Robertson, supra,* 293 Or at 411 n 8.[7]

■ Defendant argues next that the initial phrase in ORS 163.095(2)(e), "in an effort to conceal the commission of a crime," is not limited by objectively reasonable criteria. He notes initially that "conceal" is not defined by the legislature. He also notes that "the term 'effort' lacks a statutory definition and a coherent standard." The statutory phrase "the murder was committed in an effort to conceal" means the murder must have been committed for the purpose of hiding the fact of the commission of the separate crime. No separate definition of "effort" or "conceal" are required.

Both ORS 163.095(2)(d) and 163.095(2)(e) identify what each prohibits. They do not present an unconstitutional risk under state or federal law of *ad hoc* or *ex post facto* application.

---

[7] "So far as 14th amendment due process requires fair notice to a defendant of what is forbidden, *Village of Hoffman Estates* [*v. Flipside, Hoffman Estates, Inc.,* 455 US 489, 102 S Ct 1186, 71 L Ed 2d 362 (1982)], explains that the defendant must show that he could not know that the (otherwise valid) terms of the law proscribed his conduct. When the law is attacked on its face in advance of potentially violative conduct, the Supreme Court stated:

" '(A court should) examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.' (footnote omitted).

"455 US at 494-95. The court noted that 'the complainant must prove that the enactment is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." ' quoting *Coates v. City of Cincinnati,* 402 US 611, 614 (1971). 455 US at 495, n. 7.

"The analysis based on fair notice to defendants, of course, does not necessarily apply equally to the other 'vagueness' objections based on legislative failure to make crucial policy choices in defining crimes and excessive transfer of those choices to prosecutors, courts, and jurors, to which we have referred above."

*Eighth Amendment vagueness*

In *Furman v. Georgia,* 408 US 238, 92 S Ct 2726, 33 L Ed 2d 346 (1972), a majority of the Court held that Georgia's capital punishment statute violated the Eighth Amendment. The justices explained that the statute operated randomly, with no rational way to distinguish those persons who were subject to the death penalty from those who were not. *See* 408 US at 240 (Douglas, J., concurring); 408 US at 306 (Stewart, J., concurring); 408 US at 310 (White, J., concurring).

Four years later, the Court upheld three death penalty statutes because each statute reduced the randomness the Court had found unconstitutional in *Furman. See Gregg v. Georgia,* 428 US 153, 96 S Ct 2909, 49 L Ed 2d 859 (1976); *Proffitt v. Florida,* 428 US 242, 96 S Ct 2960, 49 L Ed 2d 913 (1976); *Jurek v. Texas,* 428 US 262, 96 S Ct 2950, 49 L Ed 2d 929 (1976). These statutes satisfied the Eighth Amendment by narrowing the class of persons on whom the death penalty could be imposed. *Zant v. Stephens,* 462 US 862, 103 S Ct 2733, 77 L Ed 2d 235 (1983). They did so either by identifying discrete categories of aggravated murder for which the death penalty may be imposed, *see Jurek v. Texas, supra,* or by requiring the jury to find at least one aggravating circumstance before deciding whether to impose the death penalty, *see Zant v. Stephens, supra.*

■ An aggravating factor or a category of aggravated murder is vague in violation of the Eighth Amendment if it does not genuinely narrow the class of persons eligible for the death penalty. *See Maynard v. Cartwright,* 485 US 356, 108 S Ct 1853, 100 L Ed 2d 372 (1988); *Godfrey v. Georgia,* 446 US 420, 100 S Ct 1759, 64 L Ed 2d 398 (1980), *cert den* 456 US 919 (1982) (plurality). *Godfrey v. Georgia* illustrates the Eighth Amendment concern. In that case, the jury had found, as an aggravating factor, that the murder was "outrageously or wantonly vile, horrible and inhuman." The plurality in *Godfrey* reasoned, however, that because almost all murders could be characterized in this way, this aggravating factor did not provide any "principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Id.,* 446 US at 433. Accordingly, it held that the factor was vague in violation of the Eighth Amendment.

■ Neither ORS 163.095(2)(d) nor (2)(e) suffers from a defect like that identified in *Godfrey*. Both describe separate, discrete classes of conduct. Subsection (2)(d) applies to murders that a defendant personally and intentionally commits during the course of or in furtherance of certain felonies. Subsection (2)(e) focuses on why the murder is committed and enhances the penalty on all murders committed for the purpose of concealing a separate crime.

In *State v. Reynolds,* 289 Or 533, 539, 614 P2d 1158 (1980), this court recognized that ORS 163.095(2)(d) does not eliminate the felony-murder elements and thereby make every murder that is committed personally and intentionally an aggravated murder. Rather, ORS 163.095(2)(d) requires proof of the elements of felony murder *and* proof that the defendant personally and intentionally committed the murder.

With respect to ORS 163.095(2)(e), defendant contends that this section is "unconstitutionally broader than the aggravated felony murder section in that it appears to punish for killings involving any crime, including misdemeanors." The fact, however, that one class of aggravated murder is broader than another does not mean that the broader class is unconstitutional. The question is not the comparative size of the two classes. Rather, it is whether the category at issue impermissibly could be applied to almost all murders.

ORS 163.095(2)(e) applies only if a separate crime is committed to conceal the commission of that crime or the identity of the perpetrator of the crime. Unlike the aggravating circumstances at issue in *Godfrey v. Georgia, supra,* ORS 163.095(2)(e) could not be applied to all or almost all murders. Rather, by describing a discrete class of criminal conduct, it genuinely narrows the class of persons eligible for the death penalty. *See Zant v. Stephens, supra,* 462 US at 878. Defendant's claim of federal constitutional violation fails.

C. *Privileges and immunities and equal protection challenges*

■ Defendant argues that ORS 163.095(2)(e) is unconstitutional because its terms can be selectively applied by prosecutors based upon arbitrary, haphazard and *ad hoc* decisions concerning whether to charge a person with aggravated murder by concealment or "regular" murder based upon the

same conduct. He reasons that, under the standards articulated in *State v. Freeland,* 295 Or 367, 667 P2d 509 (1983), and *State of Oregon v. Pirkey,* 203 Or 697, 704-05, 281 P2d 698 (1955), the challenged section of the aggravated murder statute violates the state privileges and immunities clause (Art I, § 20) and the federal equal protection clause (Am XIV).

In *State v. Freeland,* Justice Linde, writing for a majority of the court, identified two categories of unequal treatment that may offend Article I, section 20:

> " 'Haphazard' or *standardless administration,* in which the procedure is chosen *ad hoc* without striving for consistency among similar cases, differs from impermissible classification, because a systematic practice of following one or the other procedure in identifiable types of cases or circumstances itself reflects some articulable policy toward classes of cases. The quoted reference in [*State v.*] *Edmonson,* [291 Or 251, 254, 630 P2d 822 (1981)], above, to 'social, geographic, or other classes of defendants' only relates to the validity of such a policy. An individual challenging purely *ad hoc,* unsystematic use or denial of one or the other procedure need not show that he has been discriminated against on grounds that would be invalid if they were the basis of a systematic policy." 295 Or at 374 (footnote omitted; emphasis added).

*Freeland* analyzed whether a prosecutor's use of two charging procedures (*i.e.,* grand jury or preliminary hearing) adhered to sufficiently consistent standards to represent a coherent, systematic policy, even when not promulgated in the form of rules of guidelines. On the factual record (which included prosecutorial reliance upon administrative convenience, minimization of cross-examination and an individual deputy's personal preference), Justice Linde wrote:

> "We agree with the circuit court that even without such *ad hominem* discrimination, the present case falls within the principle that equal treatment may not be denied 'haphazardly' by *ad hoc* decisions that, as the court quoted from [*State v. Edmonson, supra,*] 291 Or at 254, do not 'uniformly rest on meaningful criteria that indeed make the privileges of a preliminary hearing equally available to all persons similarly situated, or, in the constitutional phrase, "upon the same terms." ' "

In *State of Oregon v. Pirkey, supra,* a former statute (Or Laws 1949, ch 129, § 1) made it a crime to draw a check

with insufficient funds, but it gave unfettered discretion to the grand jury or magistrate (to whom the complaint is made or the action tried) to proceed against the defendant by a felony or a misdemeanor. In declaring the statute unconstitutional, this court stated:

> "So far as the statute is concerned, the same identical act, under the same circumstances, may constitute a felonious crime when committed by one person, and a misdemeanor when committed by another. * * * ·

> "* * * [S]ince the statute itself furnishes no criterion by which to determine when an accused is to be charged with felony, and when with a misdemeanor, the statute, at least insofar as it provides for alternative charges, must be void by reason of constitutional mandate * * *." 203 Or at 704-05.

Defendant acknowledges that in *State v. Reynolds, supra,* 289 Or at 538-40, this court found no constitutional violation of the aggravated felony murder statute, ORS 163.095(2)(d), wherein the court reasoned that a prosecutor's "discretion is not unfettered" because a criterion existed for the charging decision. The aggravated felony murder statute is distinguishable from its unaggravated counterpart, ORS 163.115(1)(b), based upon the additional element of "personal commission of the homicide."

Nevertheless, defendant argues that the section defining aggravated murder by concealment, ORS 163.095(2)(e), is indistinguishable from the unaggravated felony murder section, ORS 163.115(1)(b), and, thus, prosecutorial discretion is not adequately limited concerning which offense to charge. Defendant asserts that regular felony murder involves the commission of a killing "in the course of and in furtherance of" or "during immediate flight" from a committed or attempted commission of certain specified felonies, ORS 163.115(1)(b). Flight necessarily constitutes an effort to conceal. Likewise, an effort to conceal necessarily occurs in furtherance of the underlying crime. Thus, defendant claims that ORS 163.095(2)(e) violates the principles of *Freeland, Pirkey,* Article I, section 20, and the Fourteenth Amendment.

ORS 163.095(2)(e) is separate from simple felony-murder. The statute requires proof that the murder was committed intentionally and for a specific purpose — to conceal

the commission of a separate crime or the identity of the crime's perpetrators. The simple felony-murder statute requires neither intent nor purpose to conceal the commission of a separate crime or to conceal the identity of the perpetrators. It applies whenever a person is killed during the course of certain felonies. The statutes are not "indistinguishable" as claimed by defendant. Because they are distinguishable, prosecutorial discretion is adequately limited.

D. *The statutory delay between the guilt and penalty phases denies defendant an impartial jury*

ORS 163.150(1) creates a temporal gap between the guilt and penalty phases. It provides:

> "Upon a finding that the defendant is guilty of aggravated murder, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to life imprisonment or death. The proceeding shall be conducted in the trial court before the trial jury *as soon as practicable.* If the defendant has pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence; however, neither the state nor the defendant shall be allowed to introduce repetitive evidence that has previously been offered and received during the trial on the issue of guilt. The court shall instruct the jury that all evidence previously offered and received may be considered for the purposes of the sentencing hearing. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Oregon. The state and the defendant or the counsel of the defendant shall be permitted to present arguments for or against a sentence of death." (Emphasis added.)

Defendant claims that the statutory delay leaves the jurors vulnerable to outside influences, such as family, friends, media analysis of the guilt verdict and speculation on the sentence. Defendant asserts that a trial court's cautionary instructions are inadequate to dispel these post-verdict influences and that in the absence of sequestration, an impartial jury is not possible.

ORS 163.150(1) provides that the penalty phase shall be conducted "as soon as practicable" after the guilt phase ends. The jury returned its verdict on the guilt phase at 9:53

p.m. on Monday evening, March 16. The penalty phase began at 9:35 a.m. on Wednesday, March 18. There was no appreciable "statutory delay" about which defendant complains. In any event, this issue is now moot because we hold today that the penalty phase of this case must now be tried by a new and separate jury.

Any assignments of error not discussed have been considered and are either moot or without merit.

The judgment is affirmed as to the guilt phase and reversed as to the penalty phase, and the case is remanded to the circuit court for resentencing consistent with this opinion.

**LINDE and FADELEY, JJ.,** dissent for the reasons stated in the dissenting opinions in *State v. Wagner,* 309 Or 5, 20, 786 P2d 93 (1990), and *State v. Moen,* 309 Or 45, 98, 786 P2d 111 (1990).