Argued and submitted September 6, judgment of conviction and sentence of death affirmed December 28, 2001

# STATE OF OREGON,
## *Respondent,*

*v.*

# KARL ANTHONY TERRY,
## *Appellant.*

## (CC 94-1337; SC S42818)

37 P3d 157

Eric Johansen, Deputy Public Defender, Salem, argued the cause for appellant. With him on the briefs were David E. Groom, State Public Defender, and Ingrid MacFarlane, Deputy Public Defender.

Robert B. Rocklin, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Kathleen Cegla and Doug M. Petrina, Assistant Attorneys General.

Before Carson, Chief Justice, and Gillette, Durham, Leeson, Riggs, and De Muniz, Justices.*

DE MUNIZ, J.

---

* Balmer, J., did not participate in the consideration or decision of this case.

## DE MUNIZ, J.

This case is before us on automatic review of defendant's convictions for two counts of aggravated murder and sentences of death. *See State v. Lotches*, 331 Or 455, 457 n 1, 17 P3d 1045 (2000) (explaining that judgment of conviction and sentence of death now subject to automatic and direct review in this court under ORS 138.012(1)). Defendant challenges the pretrial, guilt, and penalty phases of his trial in 22 assignments of error. For the reasons set out below, we reject each of defendant's assignments of error and affirm the convictions for aggravated murder and sentences of death.

## I. FACTS

■ Because the jury found defendant guilty of the crimes charged, we view the evidence presented at trial in the light most favorable to the state. *State v. Thompson*, 328 Or 248, 250, 971 P2d 879 (1999).

On August 6, 1994, Jeffrey Brown (Jeff) invited defendant to celebrate the birthday of Jeff's brother Dale Brown (Dale). Defendant and Jeff had spent a lot of time together. According to defendant's writings, they belonged to an organization that defendant called the "Order of the Black Dove." The creed of the Order of the Black Dove, as reflected in defendant's journals, celebrated violence and other anti-social behavior.

Defendant accepted the invitation and met Jeff and Dale at approximately 2:30 or 3:00 p.m. that day. The three of them drank beer together and, eventually, decided to go camping on the Willamette River. The brothers collected their gear, and Jeff brought a samurai or ninja knife that he owned. The group obtained cash from an ATM machine and purchased a six-pack of beer. At the river, they drank more beer and argued about where to camp. Witnesses recalled seeing defendant with Jeff and Dale at the river before 9:00 p.m., and also recalled that defendant was wearing a black leather jacket. Defendant was seen alone at the river at about 9:15 p.m.

The next day, Bennie Garry and his two sons went fishing at the Jefferson Milwaukee boat landing. The younger son tired of fishing and decided to play elsewhere. A few minutes later, he returned and reported that there was a dead man nearby. The older son investigated and returned to tell his father that the man had a hole in his neck. Garry then found two bodies, one that appeared to be sleeping on the ground and one that was in a sleeping bag. He notified police. The police concluded that the victims had been killed where they were found. Although the police surveyed the area, they did not find a weapon. The victims were identified as Jeff and Dale.

Jeff had lived in an apartment above a restaurant where he worked. The owner of the restaurant let the police into the apartment, where they made a brief, preliminary search. The owner noticed that Jeff's keys were on the counter and that the deadbolt, usually locked, was unlocked. After notifying the parents and obtaining permission, the police searched Jeff's apartment more thoroughly and discovered defendant's black motorcycle jacket inside a backpack. A witness had seen defendant leaving Jeff's apartment on the night of the murders at about 9:30 p.m. Defendant was not wearing a jacket at that time.

On August 8, 1994, the police again went to Jeff's apartment. While searching the apartment, Detective Corson noticed that the telephone had a redial function. He pressed the button. The person who answered the call identified himself as "Karl," i.e., defendant. Defendant acknowledged that he was a friend of Jeff's. Corson asked if he could speak with defendant in person at his apartment in Portland. Defendant agreed.

When Corson arrived at defendant's apartment, defendant gave him a paper sack containing a knife, saying that he was aware that the police were looking for knives. According to defendant, the knife had belonged to Jeff. Defendant also handed Corson a written statement, and agreed to go to a Portland police station to give an interview. At the interview, Corson advised defendant of his *Miranda* rights and recorded defendant's oral statement. In that statement, defendant indicated that he had left Dale and Jeff at

the river at about 8:00 p.m. He denied that he had fought with them. Corson and Detective Kidd then took defendant home but, on the way, stopped for some cigarettes. At his apartment, defendant invited the police inside and permitted them to look around. The officers explained to defendant that they had no right to look inside his apartment without a warrant and that anything incriminating that they might find could be used against him. Defendant was cooperative and signed a consent-to-search form. The police searched the apartment but did not seize anything.

On August 9, 1994, Kidd telephoned defendant and obtained defendant's consent to take a polygraph examination. The next day, when Kidd arrived at defendant's apartment, defendant refused to submit to the polygraph examination and walked away, stating that he had given the police all the information that he had.

On August 19, 1994, the police obtained a search warrant for defendant's apartment. Four officers—Corson, Kidd, Trooper Nguyen, and Sergeant McCrum—went to defendant's apartment to execute the warrant. The officers talked to defendant through the front door. When that discussion was unavailing, the police forced the door open. Once the police were inside, defendant sat calmly at a table and watched the officers. Corson informed defendant that he was not under arrest and that he was free to leave while the officers conducted the search. Despite that invitation, defendant remained in the apartment and even assisted the officers in their search.

The police seized various items from the apartment and obtained defendant's consent to take a polygraph test and to have his blood drawn. The police took defendant to the hospital to obtain a blood sample and then returned him to his apartment.

On August 22, 1994, Corson and Nguyen transported defendant to the location of the polygraph examination. Before the examination, the examiner, Detective Bryant, advised defendant of his *Miranda* rights. After the examination, Bryant informed defendant that his answers were deceptive. Defendant indicated that he wanted to talk to Corson and the others about his test. During the ensuing

conversation with the officers, McCrum referred to inconsistencies in defendant's statements. Defendant became agitated and responded, "How about if I let you talk to my attorney? I want to go home." McCrum responded, "That's fine." Defendant then sat down and asked McCrum questions about the investigation, and stated, "How do you expect me to remember everybody that was outside there that day? I was drunk." McCrum answered defendant's questions, and defendant calmed down.

Defendant then went outside with the officers to smoke a cigarette. Once outside, he discussed with the officers whether he would have interfered in a fight between Dale and Jeff. He then began to ramble about having blackouts. He also asked about what the DNA analysis of the blood on his jacket might reveal. He was told that, according to preliminary tests, the blood might be Dale's, but that further testing would be undertaken. Defendant responded, "I just want to go home. Maybe you guys should talk to my attorney." McCrum replied, "Okay. Fine." They began to walk toward the police vehicle. On the way to the vehicle, defendant asked more questions of the officers and speculated about why a person might black out. Defendant asked more questions about the blood on the jacket. After the officers answered his questions, defendant declared, "I want to go home." About 7:00 p.m., the officers drove him home.

When they arrived at defendant's apartment, defendant stated, "I'm fucked either way. No matter what I tell you, the D.A. is going [to] put me in prison, that's for sure." Corson told defendant that the district attorney would review the information that the police provided to him. Defendant inquired whether the police would appoint him an attorney. Corson said he could not appoint an attorney for defendant, and explained that, if defendant wanted an attorney, he should say so, and then asked whether defendant wanted the officer not to ask any further questions without an attorney present. Corson elaborated that, "If you want to have an attorney, you need to tell me and I will not have any contact or conversation with you." Defendant replied that he knew his rights and asked for Corson's business card. Defendant took the card and said that he might call Corson later that

night. He then said that he definitely would call Corson the next day. The officers left.

About a half-hour later, Corson suggested that Nguyen call defendant at his apartment. Nguyen called defendant and asked how he was doing. Nguyen intimated that he knew that defendant wanted to talk to them, but was having difficulty doing so. Defendant indicated that he was worried about going to jail and no longer receiving his social security checks. Nguyen explained that the police gather information and give that information to the district attorney to make a charging decision. Defendant agreed to speak with the police again that evening.

Corson and Nguyen arrived at defendant's residence and defendant spoke to them in an unmarked patrol car. After being advised of his rights, and after acknowledging that he was speaking voluntarily, he told the police his version of the events that led to the killings. According to defendant, Dale and Jeff started fighting, Dale killed Jeff, and defendant killed Dale in Jeff's defense. Defendant agreed to help the police search for the murder weapon at the scene. Corson wanted to advise defendant of his constitutional rights again, but defendant refused, stating that he did not want a lawyer and that he knew what his rights were. Defendant recited his rights to the officers. He described to them how and where he had disposed of a sword. They then drove to the crime scene and engaged in a fruitless search for the sword. Defendant identified the area in which the sword should be located. It was getting late in the evening, and defendant indicated that he would help the police again the next day. Defendant said that he was hungry, so an officer took him to buy some food and then took him home.

The next day, Corson and Nguyen arrived at the front door of defendant's apartment and found a note fixed to the door stating that defendant did not wish to cooperate further. Later that day, the police arrested defendant. The police also found a samurai sword near the location that defendant had identified. DNA testing of blood on the sword indicated that the blood belonged to Dale and Jeff. Defendant's black leather jacket also had Dale's and Jeff's blood on it.

In October 1994, while in detention in the Clackamas County Jail, defendant told a fellow prisoner that Jeff had wanted out of the Order of the Black Dove. Defendant also told the prisoner that the only way out was death, and that he had killed Jeff with a "big knife."

Defendant was tried and convicted of the murders of Dale and Jeff, and sentenced to death. This automatic review followed. ORS 138.012(1).

## II. ADMISSIBILITY OF DEFENDANT'S STATEMENTS TO POLICE

Defendant contends that the trial court erred in permitting defendant's statements to be admitted into evidence. Before trial, defendant moved to suppress his statements to the police, in which he claimed that he had killed Dale in Jeff's defense, citing Article I, sections 9,[1] 11,[2] and 12,[3] of the Oregon Constitution, and the Fourth,[4] Fifth,[5] Sixth,[6] and

---

[1] Article I, section 9, of the Oregon Constitution, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[2] Article I, section 11, of the Oregon Constitution, provides, in part:

"In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel[.]"

[3] Article I, section 12, of the Oregon Constitution, provides, in part:

"No person shall be * * * compelled in any criminal prosecution to testify against himself."

[4] The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[5] The Fifth Amendment to the United States Constitution provides, in part:

"No person * * * shall be compelled in any criminal case to be a witness against himself[.]"

[6] The Sixth Amendment to the United States Constitution provides, in part:

"In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

Fourteenth Amendments[7] to the United States Constitution. Following a hearing, the trial court denied the motion, concluding

> "that in each of the interviews defendant was not in custody. To the extent his comments regarding an attorney could be construed to be an exercise of his right to counsel, it was waived by his continuing the conversations with police."

On appeal, defendant argues that his statements were involuntary and that the trial court should have suppressed them because his mental health had been fragile, the police had made an express or implied promise of leniency, and police questioning had been persistent and involved the "false friend" investigation technique. In addition, defendant argues that the trial court should have suppressed his statements because he "equivocally invoked" his right to counsel, and the police had not clarified his intent. Although defendant identifies a number of statements that he made, he challenges only the substance of the interview that took place on August 22, 1994, during which he confessed to killing Dale in Jeff's defense.

### A. Alleged Involuntariness of Statements

■■ In reviewing the voluntariness of defendant's statements, this court is bound by the trial court's findings of historical fact if the evidence supports them. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). We are not bound by the trial court's ultimate holding as to voluntariness, however, and we assess anew whether the facts are sufficient to meet constitutional standards. *State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991).

■ Defendant has failed to identify any evidence in the record that provides a basis for a conclusion that the police made an offer of leniency to defendant or employed some other fraudulent tactic to obtain defendant's statement. He offers instances of contact with the police that do not indicate

---

[7] Section 1 of the Fourteenth Amendment of the United States Constitution provides, in part:

"No State shall * * * deprive any person of life, liberty, or property, without due process of law[.]"

any misconduct on their part or anything that would have encompassed some form of deception. He argues that the police obtained a statement from him "by leading [him] to believe that they cared about him and were interested in his well-being," and that his statement "was derived through the implied representation of leniency that one would expect of a friend." Defendant thus attempts to construe courtesy and civility as some form of deceit. The police did not mislead defendant and, indeed, defendant understood that the police had thought that he was the prime suspect. He acknowledged that fact, for example, when he told the police that "the D.A. is going [to] put me in prison, that's for sure." Similarly, defendant's reference in his argument to his "mental health" is not sufficiently developed to conclude that his state of mind made his statement involuntary.

B. *Right to Counsel*

 Although a trial court's findings of historical fact are binding on this court if the evidence supports them, we review legal conclusions regarding the invocation of the right to counsel for legal error. *State v. Montez*, 309 Or 564, 572-73, 789 P2d 1352 (1990). Defendant's references to his right to counsel during questioning are not a basis for reversal for two reasons.

 First, defendant was not in custody when he mused that the police perhaps should talk to his attorney. The invocation of the right to counsel under Article I, section 12, of the Oregon Constitution, requires police questioning to cease only when a defendant is in custody, *i.e.*, not free to leave. However, when a person gives an interview, even at a police station, of his own free will, and is "free to answer questions, or not to answer, or simply to end the meeting," that person is not in custody. *State v. Smith*, 310 Or 1, 8, 791 P2d 836 (1990). Similarly, under the Fifth Amendment to the United States Constitution, a person is in custody only if his or her freedom has been "significantly restrained"; voluntary participation in a police interview at the police station generally does not constitute a significant restraint. *Id.* (citing *Oregon v. Elstad*, 470 US 298, 309, 105 S Ct 1285, 84 L Ed 2d 222 (1985) and *Oregon v. Mathiason*, 429 US 492, 495, 97 S Ct 711, 50 L Ed 2d 714 (1977). Here, defendant referred to an

attorney on four occasions. However, in each instance, which we set out below, he was free to leave, and he chose not to.

1. After the polygraph examination, when defendant had indicated that he wanted to talk to the officers about the test, defendant made an ambiguous statement about "How about if I let you talk to my attorney" and expressed a desire to "go home." An officer responded, "That's fine." At that point, defendant sat back down in his chair.

2. Defendant went outside to smoke a cigarette. He talked to the officers about the testing of the blood on his jacket. Defendant stated, "I just want to go home. Maybe you guys should talk to my attorney," to which an officer responded, "Okay," and began walking toward the police vehicle to leave. Defendant then persisted in asking more questions of the officers. After the officers responded to his questions, defendant stated again that he wanted to go home, and the officers took him home.

3. When they arrived at his residence, defendant asked whether the police would provide him with an attorney. Corson told defendant that, if he wanted an attorney, he should say so. Corson asked defendant whether he wanted an attorney. Defendant replied that he knew his rights; he then accepted a business card from Corson and discussed when they would speak again.

4. Defendant agreed to speak with the officers again. When Corson attempted to advise defendant of his rights, defendant stated that "he didn't want a lawyer and he knew what his rights were." He acknowledged that his statement that he had killed Dale was voluntary.

In each of those four instances, defendant was free to leave, yet he remained. We conclude that defendant was not in custody when he mentioned the subject of counsel.

Second, each time that defendant mentioned counsel, he rejected the idea in favor of cooperating with the police and engaging in further conversation about the investigation, thereby waiving any protection from interrogation. *See State v. Meade*, 327 Or 335, 341, 963 P2d 656 (1998) (suspect who has made equivocal request for counsel thereafter may

waive right to have counsel present during that or later interrogation). In each instance noted above, defendant appeared to have weighed his options of remaining silent versus cooperating with the police and decided that he wanted to cooperate, or at least engage in dialogue. At times, defendant refused to cooperate, thereby demonstrating that he was aware of his rights. In fact, he was so aware of his rights that he could recite them.

We conclude that defendant's constitutional right to counsel under the Oregon Constitution and the United States Constitution was not violated, and that his statements properly were admitted at trial.

## III. REFERENCE TO POLYGRAPH AT TRIAL

Defendant maintains that the court erred in denying his motions to dismiss and for a mistrial because a witness made a passing reference to the fact that defendant had taken a polygraph test. Trooper Nguyen testified at trial that he had been present when defendant was interviewed at the police station on August 22, 1994, and that he had accompanied Corson when they drove defendant home. Specifically, Nguyen testified on direct examination:

"Q: [Prosecutor] And after you got back to the police station at about 7:40, did you place a telephone call to the defendant?

"A: [Nguyen] That's correct, I did.

"Q: Before doing that, did you discuss that with Detective Corson?

"A: Yes, I did.

"Q: What did you—what was the conversation you had with [defendant] on that occasion?

"* * * * *

"A: On that day what I did was I placed a telephone call to [defendant] and spoke to him in general conversation at first. And then [defendant] initiated conversation with me further.

"Q: What did you tell him about why you called when you first called him?

"A: Oh. I stated to [defendant] that I called because I wanted to see how he was doing because I knew that the polygraph examination that he took and the interviews—"

Defense counsel cut off the witness, stating that he had a matter for the court. Outside the jury's presence, defense counsel stated that, "[i]t was our understanding, Your Honor, that all witnesses had been cautioned not to get into the issue of polygraphs taken, polygraphs not taken." The prosecutor apologized that he had forgotten to caution Nguyen about referring to any polygraph and did not know that Nguyen was going to mention one. Defendant moved for a mistrial or, alternatively, for a curative instruction. The trial court observed that Nguyen's answer was not responsive to the question asked and that no one in the room had expected the answer that followed. The court adjourned for the day before making a decision.

The next day, defendant moved to dismiss the case or, alternatively, for a mistrial, and argued that a curative instruction was insufficient because implicit in Nguyen's statement was an inference that defendant had failed the polygraph examination. The trial court denied those motions and opined that a curative instruction would be adequate:

"[W]hen words are said in a courtroom, they ring in our ears and I don't know what they ring to the juror's ears. I think it was stated in a context that didn't indicate a result. That, at best, an instruction that is neutral along the line prepared by the State that 'disregard the last response' won't bring that response back to their attention. And I assume the jurors follow the instructions that judges give them, that they disregard that evidence."

Consistent with the foregoing observations, the trial court instructed the jury as follows:

"Yesterday there was an answer given by the witness on the stand, Mr. Nguyen, that wasn't responsive to the question asked. That testimony is stricken. You will disregard it."

This court reviews a trial court's decision to deny a mistrial motion for abuse of discretion. *State v. Larson*, 325 Or 15, 22, 933 P2d 958 (1997). We recognize that "[t]he trial

judge is in the best position to assess the impact of the complained-of incident and to select the means (if any) necessary to correct any problem resulting from it." *State v. Wright*, 323 Or 8, 12, 913 P2d 321 (1996). With respect to the polygraph, this court has held that evidence of the *results* of a polygraph examination is inherently prejudicial. *See State v. Lyon*, 304 Or 221, 233-34, 744 P2d 231 (1987) (polygraph evidence not admissible by stipulation); *State v. Brown*, 297 Or 404, 445, 687 P2d 751 (1984) (polygraph evidence inadmissible over proper objection); *State v. Middleton*, 295 Or 485, 492, 668 P2d 371 (1983) (polygraph evidence "inherently prejudicial").

■ Despite the general inadmissibility of polygraph evidence, law enforcement agencies often use polygraph tests in the course of investigation and, despite vigilant efforts, reference to them occasionally finds its way into courtroom testimony. This court has held that it is not an abuse of discretion to refuse a motion for a mistrial based on a passing reference to a polygraph examination when that reference did not disclose the results of that examination. For example, in *State v. Farrar*, 309 Or 132, 786 P2d 161 (1990), defense counsel asked a state witness whether he had reviewed his statement with the police or a prosecutor, to which he replied, "[w]e went over roughly the same questions that were asked during the lie detector test and during tapings they took at [the] police station." *Id.* at 162. The defendant moved for a mistrial, which the trial court rejected. This court affirmed, reasoning that "[t]he reference did not warrant a mistrial because it was isolated and made only in passing, the results of the test were not disclosed, and the state never argued that the test had any significance to the witness's credibility or to any other issue in the case." *Id.* at 164. Likewise, in *State v. Eby*, 296 Or 63, 673 P2d 522 (1983), this court affirmed a lower court's decision to deny a mistrial motion based on a witness's brief reference to a polygraph examination, because "reference to the word 'polygraph,' without more, was so indefinite as to render any prejudicial effect speculative at best." *Id.* at 77-78.

In this instance, the trial court found that the witness's testimony referring to the polygraph examination was inadvertent and did not imply the results of the examination.

The court was uncertain whether the jury might have understood the reference to it at all. Although Nguyen's telephone call to defendant possibly could have indicated a sign of concern on Nguyen's part that defendant had failed the test, the call also could have suggested that defendant's performance in the test had been favorable, because defendant had been released and Nguyen was calling him at home. Hence, Nguyen's testimony was ambiguous as to whether defendant's polygraph results were favorable or unfavorable to defendant.

In such circumstances, a curative instruction is sufficient to neutralize the possibility of prejudice to the defendant. "Jurors are assumed to have followed their instructions, absent an overwhelming probability that they would be unable to do so." *Smith*, 310 Or at 26. The instruction did not mention the critical testimony and informed the jurors to disregard as unresponsive what Nguyen had mentioned.

We conclude that the trial court did not err in denying defendant's motions to dismiss and for a mistrial, in light of the curative instruction given.

## IV. PENALTY-PHASE ISSUES

### A. *Admissibility of Victim-Impact Evidence*

Defendant argues that the trial court erred in admitting victim-impact evidence in the form of a statement that the victims' mother had read to the jury during the penalty phase. At the outset of the proceedings, the law did not provide specifically for the admission of victim-impact evidence during the penalty phase of an aggravated murder trial. *See* ORS 163.150 (1993) (outlining penalty-phase procedures prior to allowance of victim-impact evidence consideration by Oregon juries). Thus, the trial court granted defendant's motion to limit victim-impact evidence and ordered the state to notify defendant of any victim-impact evidence that it intended to present. Defendant's motion did not raise any federal or state issues regarding prohibitions on *ex post facto* laws.

Effective July 7, 1995, the legislature amended ORS 163.150(1)(a) to permit a jury to consider, during the penalty

phase, "victim impact evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family[.]" *State v. Hayward*, 327 Or 397, 412, 963 P2d 667 (1998). As a result of the legislature's enactment of the new statute, the trial court reversed its prior ruling and decided to permit the state to offer victim impact evidence.

In accordance with that ruling, the state offered a written statement from the victims' mother that the defense had reviewed. The victims' mother read the following statement to the jury:

"Jeffrey Ray Brown, 23 and a half years, Dale Archie Brown, 22 years, I had the privilege of being their mother.

"Jeffrey was my first born, my obedient child. After all, he was told to get off the table before he fell and broke something in our nursery, so he did fall off the table and [break] his arm.

"Dale was my baby. My loving child. He would be outside playing, suddenly stop, come running inside to say, 'Mommy, I love you,' and run back outside to continue to play.

"They will never marry, have children, grow old. They will walk with God forever. They made that choice as young children. I will miss seeing them grow, but this I know, I will be with them in God's good time.

"Jeffrey Ray Brown, 23 and a half years, Dale Archie Brown, 22 years, I had the privilege of being their mother.

"This past year at family gatherings as I listened to my sister-in-law talking about their daughters-in-law, grandchildren, and even a great grandchild, I delighted in hearing the stories and I hope they will always continue. And yet at the same time I was greatly saddened as I will never enjoy the pleasure of a daughter-in-law. I will never enjoy the pleasure of a grandchild and I will never enjoy the pleasure of a great grandchild. Mr. Terry, you took those opportunities from me when you murdered my sons, Jeffrey and Dale.

"During this past year, as my brothers and I rallied around my mother to lend her emotional and physical support in dealing with her first year as a widow, I was pleased and proud of our willing ability to do so, and yet at the same

time I was greatly saddened as I realized that when either my husband or I reached that stage in life, we will be truly alone, no children to lift us up as my brothers and I lifted my mother. Mr. Terry you have taken that from us when you murdered our sons, Jeffrey and Dale."

Afterwards, defendant renewed his objection to the victim impact testimony:

"I believe that earlier in the case that there was a motion regarding victim impact. I am certainly aware of the recent statute. We'll stand on our previous objections over the impact."

The trial court then overruled the objection in light of the amended statute.

 On appeal, defendant maintains that the victim impact evidence at trial violated the *ex post facto* prohibitions set out in Article I, section 21, of the Oregon Constitution,[8] and Article I, section 10, of the United States Constitution.[9] The *ex post facto* clause of the Oregon Constitution, for example, forbids the retroactive application of certain types of criminal statutes. *See generally State v. Fugate*, 332 Or 195, 211, 26 P3d 802 (2001) (discussing doctrine).

In this instance, however, defendant failed to preserve the issue for review, because he made no objection in the trial court that referred to either the federal or state *ex post facto* doctrine.[10] Ordinarily, this court will not consider any matter assigned as error unless it was preserved in the lower court. ORAP 5.45(4)(a); *see State v. Montez*, 324 Or 343, 356, 927 P2d 64 (1996) (claim of error not preserved when defendant failed to object to testimony on grounds asserted on appeal). Indeed, defendant admits that "[i]t does not appear on the record * * * that defendant specifically asserted that application of the 1995 version of ORS 163.150 violated the *ex post facto* provisions of the Oregon and U.S.

---

[8] Article I, section 21, of the Oregon Constitution, provides, in part:

"No *ex post facto* law * * * shall ever be passed[.]"

[9] Article I, section 10, of the United States Constitution, provides, in part:

"No State shall * * * pass any * * * ex post facto Law * * *."

[10] Defendant's prior objections to the victim-impact evidence were tendered before the legislature changed the law.

Constitutions." Defendant suggests, without citing a basis in the record, that the issue may have been raised "off the record." This court, however, will not look outside the record to find objections.

We also reject defendant's alternative argument that his more generalized objections preserved the issue for review, when those objections did not include a citation or other reference either to Article I, section 21, of the Oregon Constitution, or to Article I, section 10, of the United States Constitution, or otherwise suggest that applying the new statute somehow was constitutionally impermissible. Defendant failed to preserve the *ex post facto* issue. *See State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988) (stressing justifications for raising issues before trial court).

Defendant next requests that this court review his *ex post facto* arguments as error apparent on the face of the record. "Even if a party fails to preserve a claim of error, appellate courts nonetheless possess discretion to consider it if it is plain error, also known as error 'apparent on the face of the record.' " *State v. Reyes-Camarena*, 330 Or 431, 435-36, 7 P3d 522 (2000). The elements of "error apparent on the face of the record" are: "(1) the error is one of law; (2) the point of law is obvious, *i.e.*, is not reasonably in dispute; and (3) the error is not one respecting which the court must go outside the record or select among competing inferences." *Lotches*, 331 Or at 472.[11] The first and third elements are present here, because the issue is whether the mother's testimony should have been admitted into evidence. Thus, the only issue is whether the error was "obvious," assuming that admitting the evidence in question was error at all. At the time of trial in this matter, and even now, the purported error is not obvious. *Ex post facto* claims frequently require an intricate constitutional

---

[11] Once those elements have been satisfied, an appellate court must exercise discretion whether to review the purported error. In deciding whether to review an error of law apparent on the face of the record, an appellate court may consider: the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way, *i.e.*, whether the trial court, in some manner, was presented with both sides of the issue and given an opportunity to correct any error. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991).

analysis. *See, e.g., Fugate,* 332 Or at 211 (engaging in *ex post facto* analysis).

When the victims' mother testified in October 1995, no case from this court or the Court of Appeals had determined whether the retroactive application of a statute permitting victim-impact evidence at trial would violate either Article I, section 21, of the Oregon Constitution, or Article I, section 10, of the United States Constitution. The first such case was not decided until four years later. *See State v. Metz,* 162 Or App 448, 461, 986 P2d 714 (1999) (1995 revision to ORS 163.150 fundamentally changed what evidence may be relevant to the issue before the jury and thus violated the *ex post facto* provision of Article I, section 21, of the Oregon Constitution). Deciding whether an error even occurred would require this court to engage in the same kind of extensive analysis that the Court of Appeals undertook in *Metz.* As a result, we conclude that the alleged error is not obvious.

Defendant failed to preserve his *ex post facto* argument for purposes of appeal, and we decline to address that argument as error apparent on the face of the record.

B. *Alleged Error in Jury Instructions*

Defendant argues that the trial court erred by instructing the jury that it could consider any aspect of defendant's life in answering the penalty-phase questions. Quoting the pertinent jury instruction in full illustrates the alleged error:

> "The first question asked by the law as to Count I is, was the conduct of the defendant that caused the death of Jeffrey Brown committed deliberately and with the reasonable expectation that the death of Jeffrey Brown would result.
>
> "The first question asked by the law as to Count II is, was the conduct of the defendant that caused the death of Dale Archie Brown committed deliberately and with the reasonable expectation that the death of Dale Archie Brown would result.
>
> "The word deliberately means that state of mind that examines and considers whether a contemplated act should

or should not be done. Deliberation is present if the thinking is being done in such a cool mental state under such circumstances and for such a period of time as to permit a careful weighing of the proposed decision. The law, however, does not prescribe a particular period of time as necessary to constitute deliberation.

"The second question asked by the law in each count is, is there a probability, meaning is it more likely than not, that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

"The third question asked by the law in each count is, shall a death sentence be imposed.

"The burden of proof beyond a reasonable doubt does not apply to the third question. As to this question, neither side bears any burden of proof. You must answer this question no if there is any aspect of the defendant's character or background or any circumstance of the events that one or more of the jurors believes justifies a sentence less than death.

"*You may consider any aspect of the defendant's life in your determination of the answers to these questions.* And in answering these questions, you are to consider any mitigating circumstances received in evidence including but not limited to the defendant's age and the extent and severity of the defendant's prior criminal conduct.

"Mitigating circumstances include those circumstances that do not justify or excuse the events, but that in your sole [judgment] may be considered as extenuating or reducing the degree of culpability and the appropriate punishment. The defendant need not establish the existence of a mitigating circumstance beyond a reasonable doubt. If you reasonably believe that a mitigating circumstance exists, then you may consider it as established.

"If you unanimously answer all three of the [preceding] questions yes, the law requires that the penalty should be death. You may answer any of the first three questions in any order. * * *."

(Emphasis added.) The questions presented to the jury followed those set out in the then-current version of ORS 163.150(1)(b) (1995).[12]

---

[12] ORS 163.150(1)(b) (1995) provided:

Defendant admits that he failed to object at trial to the sentence in the jury instructions that he now challenges. Accordingly, defendant requests that this court review the alleged error as an error of law apparent on the face of the record. As noted above, this court, in its discretion, may review such alleged errors if the error is a legal error discernable in the record, and the point of law is not reasonably in dispute.

Defendant makes *no* argument that the purported error is an obvious one. Indeed, the error is not obvious because Oregon appellate courts have not ruled on the inclusion of that particular sentence in penalty-phase jury instructions. In fact, in conjunction with a slightly different suggested formulation of the four questions set out in ORS 163.150(1)(b) (1993), this court previously had approved in substance an instruction that stated:

> "You may consider any aspect of defendant's life in your determination on the fourth question [here, the third question] and any aspect of defendant's life that may be relevant in your determination of the first three questions."

*Farrar*, 309 Or at 177.[13] There is little, if any, substantive difference between the two instructions. Defendant has not demonstrated that the error, if it existed at all, is obvious.

---

"Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

In this case, the jury did not consider subsection (C), regarding provocation, so that subsection (D), ordinarily the "Fourth Question," became in this case the "Third Question."

[13] The court in *Farrar* suggested that the four questions that ORS 163.150(1)(b) requires could be asked in the following manner:

"1. Was the conduct of the defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that death of the deceased or another would result?

Defendant failed to preserve his argument that the jury was improperly instructed, and we decline to address the argument as error apparent on the face of the record.

## C. *Allegedly Defective Indictment*

Defendant asserts that the trial court erred in sentencing him to death. He maintains that, because the penalty-phase instruction must include an element of "deliberation" to make him death eligible, the indictment that *charged* him had to specify that he had acted deliberately. He bases that argument on this court's decision in *State v. Quinn*, 290 Or 383, 623 P2d 630 (1981), and on a relatively recent United States Supreme Court case, *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000).

The indictment in this case stated:

"The above-named defendant is accused by the Grand Jury of the County of Clackamas, State of Oregon, by this indictment of the crimes of AGGRAVATED MURDER (TWO COUNTS) committed as follows:

"COUNT I (ORS 163.095)

"The said defendant on or about the 7th day of August 1994, in the County of Clackamas, State of Oregon, did unlawfully and intentionally cause the death of another human being, to-wit: Jeffrey Ray Brown by stabbing him, the said defendant having unlawfully and intentionally, in the course of the same criminal episode caused the death of

---

"2. Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society? In determining this issue, you shall consider any mitigating circumstances offered in evidence, including, but not limited to, the defendant's age, the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed.

"(If raised by the evidence) 3. Was the conduct of the defendant in killing the deceased unreasonable in response to the provocation, if any, by the deceased?

"4. Should defendant receive a death sentence? You should answer this question 'no' if you find that there is any aspect of defendant's character or background, or any circumstances of the offense, that you believe would justify a sentence less than death."

*Farrar*, 309 Or at 177.

an additional human being, to-wit: Dale Archie Brown by stabbing him * * *.

"COUNT II (ORS 163.095)

"The said defendant on or about the 7th day of August 1994, in the County of Clackamas, State of Oregon, did unlawfully and intentionally cause the death of another human being, to-wit: Dale Archie Brown by stabbing him, the said defendant having unlawfully and intentionally, in the course of the same criminal episode caused the death of an additional human being, to-wit: Jeffrey Ray Brown by stabbing him * * *."

Defendant thus was charged with aggravated murder under ORS 163.095(1)(d) (1993), which required that the murder be committed intentionally and that there be more than one murder victim during the same criminal episode. *See* ORS 131.505(4) (1993) (defining "criminal episode").

During the penalty phase, the jury was asked to determine "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result." *See* ORS 163.150(1)(b)(A) (1993) (setting out first question that must be asked in penalty phase). As noted, defendant contends that, under *Quinn* and *Apprendi*, "deliberateness" is an element that had to be set out in the indictment.

Defendant admits that he "did not object in the trial court to his sentence on the grounds asserted here." However, defendant argues that the state's failure to plead "deliberation" in the indictment deprived the trial court of subject matter jurisdiction and that lack of subject matter jurisdiction can be raised at any stage of the proceedings. *See Ailes v. Portland Meadows, Inc.*, 312 Or 376, 383, 823 P2d 956 (1991) (lack of subject matter jurisdiction may be raised at any time, including on appeal). Defendant also argues that this court should review the matter as "error apparent on the face of the record."

Even assuming that defendant were correct that deliberateness is an element of the crime that must be pled in the indictment—a claim that we consider and reject for the

reasons explained below—such a defect would not have deprived the court of subject matter jurisdiction.

■ Subject matter jurisdiction defines the scope of proceedings that may be heard by a particular court of law and is conferred by statute or the constitution.[14] *See* Charles E. Torcia, *Wharton's Criminal Procedure*, § 11 at 95 (13th ed 1989) ("A criminal court has jurisdiction, *i.e.*, the power to determine whether an accused is guilty of a particular crime and, if so, to impose a punishment therefor, if it has jurisdiction of the subject matter and of the person of the accused."); *see also State v. Webb*, 324 Or 380, 393, 927 P2d 79 (1996) (holding that legislature granted two separate kinds of jurisdiction to district courts, *i.e.*, same criminal jurisdiction as justice court and concurrent jurisdiction with circuit courts of misdemeanors for which punishment may not exceed $3,000 fine). Under the Oregon Constitution, circuit courts have subject matter jurisdiction over all actions unless a statute or rule of law divests them of jurisdiction. *See* Or Const, Art VII (Amended), § 2 (not changing jurisdictional scheme set out in original Article VII); Or Const, Art VII (Original), § 9 (all jurisdiction not vested by law in another court shall be vested in circuit courts). In particular, the Oregon Constitution states that, once a person has been indicted by a grand jury, that person can be charged "in a circuit court with the commission of any crime punishable as a felony." Or Const, Art VII (Amended), § 5(3). The trial court therefore had subject matter jurisdiction to try defendant for the crime of aggravated murder, even if the indictment arguably was defective.[15]

■ Defendant claims that, even if his jurisdictional challenge is not well taken, this court should address the merits of the issue as an "error apparent on the face of the record."

---

[14] Subject matter jurisdiction differs from personal jurisdiction, which governs the assertion over the person of the accused. *See* ORS 131.205-.235 (1993) (defining principles of personal jurisdiction in criminal matters).

[15] An indictment, if it is defective, may be reviewed for error rather than for lack of subject matter jurisdiction. *See, e.g., State v. Trueax*, 315 Or 396, 845 P2d 1291 (1993) (discrepancy between caption of indictment charging sodomy in third degree, required remand for entry of conviction for sodomy in third degree, not new trial); *State v. Woodson*, 315 Or 314, 845 P2d 203 (1993) (amendment of indictment to allege attempted rape rather than rape was not error).

As noted, for this court to do so, the alleged error must be "obvious, *i.e.*, not reasonably in dispute." *Lotches*, 331 Or at 472. An analysis of *Quinn* and *Apprendi*, in appropriate context, demonstrates that, not only is the alleged error not obvious, in fact, there was no error.

In *Quinn*, this court stated that the new death-penalty statute enacted by initiative in 1978 and at issue in that case

> "restore[d] deliberation as an additional element of murder for which a greater penalty, death, may be imposed much as it was under the pre-1971 statutory scheme. Although it is in the form of an enhanced penalty statute, an effect of the new statute is to indirectly reestablish a crime of deliberate first degree murder punishable by death."

290 Or at 403 (footnote omitted).

Thus, under the statutory scheme at issue in *Quinn*, "deliberation" served to enhance the penalty for intentional murder from life imprisonment to death, and indirectly created a separate crime of deliberate murder. Following this court's decision in *Quinn*, the legislature enacted statutes creating the crime of aggravated murder. Separate crimes of murder and aggravated murder are now defined statutorily. Because defendant was charged under a different statutory scheme from the one at issue in *Quinn*, that case does not support defendant's argument.

In fact, in *State v. Wagner*, 305 Or 115, 172, 752 P2d 1136 (1988), *vacated and remanded on other grounds* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989), this court rejected an argument much like the one defendant makes here. In *Wagner*, the court described the aggravated-murder statutes and accompanying pleading requirements as follows:

> "The offense with which this defendant is charged is aggravated murder as defined in ORS 163.095(2)(a)(E) [murder of a witness], * * *. The ultimate facts that make up that offense are clearly alleged in the indictment. *To be guilty of aggravated murder one does not need to act 'deliberately.'* If one is guilty of aggravated murder but the jury does not unanimously find that the perpetrator acted deliberately, the guilty one is not sentenced to death but is yet guilty of

aggravated murder. There is no requirement of pleading an indictment that requires the indictment to set forth possible penalties that the law may fix for guilt on a particular charge."

305 Or at 172 (emphasis added); *see State v. Moen*, 309 Or 45, 53, 786 P2d 111 (1990) (*Wagner* "holds only that the three [penalty-phase] questions need not be alleged" in the indictment).

Furthermore, Article I, section 40, of the Oregon Constitution, now provides that:

"[T]he penalty for aggravated murder as defined by law shall be death upon unanimous affirmative jury findings as provided by law and otherwise shall be life imprisonment with minimum sentence as provided by law."

Defendant's reliance on *Apprendi* also is misplaced. *Apprendi* involved a defendant who fired several shots into the house of an African-American family. The indictment did not charge any "hate crime" sentencing enhancement under New Jersey law. The defendant pleaded guilty to several counts set out in the indictment, including second-degree possession of a firearm for an unlawful purpose. In the penalty phase, however, the sentence corresponding to that count was enhanced as a hate crime beyond the statutory maximum for the underlying crime of second-degree unlawful firearm possession. The United States Supreme Court held that, under the Due Process Clause of the Fourteenth Amendment, any fact that increases the penalty beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *See Apprendi*, 530 US at 476, 120 S Ct at 2362-63. Under *Apprendi*, in the absence of a jury trial to determine the enhanced sentence, the defendant would have had to plead guilty to an indictment that contained the factual findings necessary to support the sentence enhancement. In this case, however, and unlike *Apprendi*, the prescribed maximum statutory penalty for the crime of aggravated murder is death and, moreover, the jury, not the trial court, decided that defendant acted deliberately.

In summary, under the current aggravated murder scheme, a sentence of death is not a "penalty enhancement." Rather, a sentence of death is one of the penalties, as is life

imprisonment, that may be imposed for the commission of the crime of aggravated murder. Because a sentence of death is not an enhancement under the aggravated murder scheme, the state is not required to allege in the indictment that the murder was committed deliberately.

## V. CONCLUSION

We have considered defendant's other assignments of error and every argument made in support of those assignments. Based on our review, we conclude that no error occurred as claimed in any of the assignments of error, including the ones not discussed in this opinion.

The judgment of conviction and sentences of death are affirmed.